**Nos. 23-549, 23-550, 23-558, 23-559, 23-561, 24-2188 & 24-2189**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

TIMOFEY BABICHENKO, PAVEL BABICHENKO,
MIKHAIL IYERUSALIMETS, PIOTR BABICHENKO, AND DAVID BIBIKOV,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Idaho, Boise
No. 18-CR-258-BLW
Hon. B. Lynn Winmill

---

## APPELLANTS' JOINT OPENING BRIEF

---

Counsel listing on next page.

Maya P. Waldron
Waldron Legal, PLLC
P.O. Box 1316
Boise, ID 83701
(208) 244-0735
maya@waldronlegal.com

Amy B. Krauss
Attorney
P.O. Box 65126
Tucson, AZ 85718
(520) 400-6170
abkrauss@comcast.net

*Attorneys for Defendant-Appellant*
*Pavel Babichenko*

Greg S. Silvey
Silvey Law Office Ltd
P.O. Box 5501
Boise, ID 83705
(208) 286-7400
greg@idahoappeals.com

Rob Lewis
Attorney At Law
913 W. River St. Ste. 430
Boise, ID 83702
(208) 395-0667
office@roblewislaw.com

*Attorneys for Defendant-Appellant*
*Timofey Babichenko*

Paul Riggins
Riggins Law
P.O. Box 653
Marsing, ID 83639
(208) 344-4152
rigginslaw@gmail.com

Mike French
Mike French Law
223 N. 6th St., Ste. 330
Boise, ID 83702
(208) 699-4709
mike@mikefrenchlaw.com

*Attorneys for Defendant-Appellant*
*Piotr Babichenko*

Craig H. Durham
Ferguson Durham, PLLC
223 N. 6th Street, Ste. 325
Boise ID 83702
(208) 724-2617
chd@fergusondurham.com

*Attorney for Defendant-Appellant*
*Mikhail Iyerusalimets*

Robyn Fyffe
Fyffe Law
PO Box 5681
Boise, ID 83705
(208) 338-5231
robyn@fyffelaw.com

*Attorney for Defendant-Appellant*
*David Bibikov*

# Table of Contents

Table of Authorities ................................................................... vi

INTRODUCTION ......................................................................... 1

JURISDICTIONAL STATEMENT ............................................. 3

BAIL STATUS ............................................................................. 3

ISSUES PRESENTED ................................................................. 4

STATEMENT OF THE CASE ..................................................... 5

    A.    Nature of the Case ...................................................... 5

    B.    Cast of Characters and Places .................................. 6

        1.    The Defendants ................................................. 6

        2.    Key Witnesses ................................................... 8

        3.    Places .................................................................. 8

    C.    Course of Proceedings ................................................ 8

        1.    Pretrial Proceedings ........................................ 8

        2.    The Trials ........................................................... 9

        3.    Post-Trial Proceedings .................................... 11

    D.    Statement of Facts ..................................................... 12

        1.    Refurbished Phones and the Secondary Market ........ 12

        2.    Apple and Samsung's Brand Representatives ........... 15

        3.    The Investigation ............................................. 16

        4.    The Defendants' Business Operations ......................... 18

        5.    Other Trial Issues ............................................ 21

SUMMARY OF THE ARGUMENT ........................................................ 23

ARGUMENT ................................................................................ 27

I.    The district court erred by declining the Appellants' proposed instruction defining a "counterfeit mark" as one that is likely to cause confusion, mistake, or to deceive about the origin of the good. ................................................................................ 27

    A.    Introduction .................................................................. 27

    B.    Background ..................................................................... 27

    C.    Legal Standards ............................................................. 30

        1.    Standard of Review ................................................. 30

        2.    Right to Present a Defense ....................................... 31

    D.    Argument ...................................................................... 32

II.    The district court erred by refusing the Appellants' proposed jury instruction that it is not a crime to repackage genuine goods not intended to confuse or deceive. ..................................... 38

    A.    Introduction .................................................................. 38

    B.    Background ..................................................................... 38

    C.    Legal Standards ............................................................. 39

        1.    Standard of Review ................................................. 39

        2.    Right to Present a Defense ....................................... 40

    D.    Argument ...................................................................... 40

III.   The district court erred by excluding defense expert Derek
       Ellington's testimony regarding the origin of the phones, and
       the Government will be unable to prove that constitutional error
       was harmless beyond a reasonable doubt. ..................................... 43

       A.    Introduction ................................................................ 43

       B.    Background ................................................................. 44

       C.    Legal Standards ......................................................... 47

             1.    Standards of Review ......................................... 47

             2.    Expert Testimony ............................................. 48

       D.    Argument .................................................................. 48

             1.    The district court erred by excluding Ellington's
                   origin testimony as irrelevant. ...................... 48

             2.    Ellington's testimony was necessary for the
                   Appellants to present a complete defense and receive
                   a fair trial, and the Government will be unable to
                   prove the error was harmless beyond a reasonable
                   doubt. ............................................................. 52

IV.    The district court abused its discretion by allowing the
       Government and its witnesses to repeatedly misuse the term
       "counterfeit" at trial. ....................................................... 54

       A.    Introduction ................................................................ 54

       B.    Background ................................................................. 55

             1.    The Appellants' Motions .................................. 55

             2.    The Second Trial .............................................. 56

       C.    Standard of Review ..................................................... 58

       D.    Argument .................................................................. 58

1.    The district court abused its discretion by allowing the Government's witnesses to misuse the term "counterfeit" while opining on the evidence. ...............58

2.    The district court should have precluded the misuse of the term "counterfeit" because it had no probative value, was confusing, and was unfairly prejudicial. ...61

V.    The district court constructively amended the superseding indictment by instructing the jury that it could convict the Appellants for conspiracy to traffic in counterfeit labels and packaging separately from any goods. ...........................63

A.    Introduction...............................................................63

B.    Background................................................................64

C.    Legal Standards .......................................................65

1.    Standard of Review.......................................65

2.    Constructive Amendment............................65

D.    Argument..................................................................67

VI.   This Court must vacate the convictions because the errors in this case cumulatively deprived the Appellants of their right to a fair trial.......................................................................70

VII.  The district court miscalculated the forfeiture money judgments by using an erroneous interpretation of the law and evidence.....72

A.    Introduction..............................................................72

B.    Background................................................................73

C.    Standard of Review ..................................................74

D.    Argument..................................................................74

iv

1.     18 U.S.C. § 981(a)(2)(B) applies to determine forfeitable proceeds because the Appellants sold lawful goods in an unlawful manner. ........................... 74

2.     The district court clearly erred by failing to exclude non-indicted brands in its calculation of criminally-derived proceeds............................................................ 83

CONCLUSION ...................................................................... 88

Statement of Related Cases .................................................. 89

Certificate of Compliance for Briefs ...................................... 90

Addendum

    18 U.S.C. § 2320 ......................................................... A-1

# Table of Authorities

## Cases

*Berenguela-Alvarado v. Castanos*, 950 F.3d 1352 (11th Cir. 2020) ....... 86

*Bradley v. Duncan*, 315 F.3d 1091 (9th Cir. 2002) ................................. 31

*California v. Trombetta*, 467 U.S. 479 (1984) ........................................ 31

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ................................. 40, 71

*Chapman v. California*, 386 U.S. 18 (1967) ................... 37, 43, 52, 54, 63

*Crane v. Kentucky*, 476 U.S. 683 (1986) ................................................. 53

*Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998) ................................................................................... 34, 49

*Honeycutt v. United States*, 581 U.S. 443 (2017) ................................... 86

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004) ................................................................................................. 34

*Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051 (9th Cir. 2008) ................................................................................................. 58

*Parle v. Runnels*, 505 F.3d 922 (9th Cir. 2007) ...................................... 71

*Stirone v. United States*, 361 U.S. 212 (1960) ................................. 65, 66

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ........................................... 51

*United States v. Adamson*, 291 F.3d 606 (9th Cir. 2002) ................. 66, 70

*United States v. Arroyo,* 75 F.4th 705 (7th Cir. 2023) ........................... 86

*United States v. Barela*, No. 1:20-CR-01228-KWR, 2021 WL 5177739 (D.N.M. Nov. 8, 2021) ....................................................................... 62

*United States v. Carpenter*, 941 F.3d 1 (1st Cir. 2019) .................... 77, 78

*United States v. Charley*, 1 F.4th 637 (9th Cir. 2021) ........................... 63

*United States v. Davis*, 854 F.3d 601 (9th Cir. 2017) ...................... 65, 66

*United States v. Dearing*, 504 F.3d 897 (9th Cir. 2007) ........................ 31

*United States v. Diaz*, 876 F.3d 1194 (9th Cir. 2017) ................. 59, 60, 61

vi

*United States v. Durham*, 464 F.3d 976 (9th Cir. 2006) ........................ 47

*United States v. Eshkol*, 108 F.3d 1025 (9th Cir. 1997)................... 31, 39

*United States v. Garcia-Paz*, 282 F.3d 1212 (9th Cir. 2002) ................. 69

*United States v. Giles*, 213 F.3d 1247 (10th Cir. 2000).................... 67, 68

*United States v. Gomez-Osorio*, 957 F.2d 636 (9th Cir. 1992) .......... 31, 40

*United States v. Haischer*, 780 F.3d 1277 (9th Cir. 2015) ............... 52, 53

*United States v. Hanafy,* 302 F.3d 485 (5th Cir. 2002).............. 40, 41, 42

*United States v. Hasan*, 718 F.3d 338 (4th Cir. 2013) ........................... 77

*United States v. Hon*, 904 F.2d 803 (2d Cir. 1990)................................. 34

*United States v. Johnson*, 875 F.3d 1265 (9th Cir. 2017) ...................... 47

*United States v. Lo*, 839 F.3d 777 (9th Cir. 2016)................................... 74

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012)........................... 78

*United States v. Mancuso*, 718 F.3d 780 (9th Cir. 2013) ................. 83, 86

*United States v. Millis*, 621 F.3d 914 (9th Cir. 2010) ............................ 32

*United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007) ........................ 58

*United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997)....................... 54

*United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009)..................... 78

*United States v. One Star Class Sloop Sailboat built in 1930 with hull no. 721, named "Flash II",* 546 F.3d 26 (1st Cir. 2008) ................. 86

*United States v. Pazsint*, 703 F.2d 420 (9th Cir. 1983)........................... 70

*United States v. Pineda-Doval*, 614 F.3d 1019 (9th Cir. 2010) ........ 52, 53

*United States v. Pollard*, 850 F.3rd 1038 (9th Cir. 2017) ...................... 74

*United States v. Prasad*, 18 F.4th 313 (9th Cir. 2021)............................ 80

*United States v. Preston*, 873 F.3d 829 (9th Cir. 2017)................... 70, 71

*United States v. Rahm*, 993 F.2d 1405 (9th Cir. 1993)............................ 59

*United States v. Ray*, 803 F.3d 244 (6th Cir. 2015) ................................. 61

*United States v. Romm*, 455 F.3d 990 (9th Cir. 2006) ........................... 32

*United States v. Ruvalcaba-Garcia*, 923 F.3d 1183 (9th Cir. 2019) ....... 48

*United States v. Ryberg*, 43 F.3d 1332 (9th Cir. 1995) ......................... 32

*United States v. Valencia-Lopez*, 971 F.3d 891 (9th Cir. 2020) ............. 48

*United States v. Warren*, 25 F.3d 890 (9th Cir. 1994) ........................... 36

*United States v. Wells*, 879 F.3d 900 (9th Cir. 2018) ........................... 47

*United States v. Williams*, 659 F.3d 1223 (9th Cir. 2011) ..................... 49

*United States v. Wofford*, 122 F.3d 787 (9th Cir. 1997) ................... 32, 40

*Wang v. Rodriguez*, 830 F.3d 958 (9th Cir. 2016) ................................. 33

## Statutes

15 U.S.C. § 1114(1)(a) ................................................................. 34

18 U.S.C. § 2 ................................................................................. 9

18 U.S.C. § 853(j) ......................................................................... 74

18 U.S.C. § 881 ............................................................................. 74

18 U.S.C. § 981 ....................................................................... 79, 80

18 U.S.C. § 981(a)(1) ............................................................... 80, 81

18 U.S.C. § 981(a)(1)(C) .......................................................... 79, 83

18 U.S.C. § 981(a)(2) ............................................................... 75, 81

18 U.S.C. § 981(a)(2)(A) ..................................................... 74, 75, 77

18 U.S.C. § 981(a)(2)(B) ................................................. 75, 78, 79, 82

18 U.S.C. § 982(a)(6)(A)(ii)(I) ....................................................... 80

18 U.S.C. § 1341 ........................................................................ 9, 78

18 U.S.C. § 1343 ........................................................................ 9, 78

18 U.S.C. § 1349 ............................................................................. 9

18 U.S.C. § 1956(a)(1)(B)(i) ................................................................ 9

18 U.S.C. § 1956(c)(7) ...................................................................... 79

18 U.S.C. § 1956(c)(7)(D) ................................................................ 79

18 U.S.C. § 1956(h) ........................................................................... 9

18 U.S.C. § 2320 ..................................................................... passim

18 U.S.C. § 2320(a) ............................................................. 9, 28, 67

18 U.S.C. § 2320(a)(1) ....... 25, 27, 32, 45, 48, 49, 50, 51, 54, 67, 68, 70, 76

18 U.S.C. § 2320(a)(2) ........................................ 25, 45, 49, 67, 68, 69, 70

18 U.S.C. § 2320(b)(1) ........................................................................ 9

18 U.S.C. § 2320(f)(1) ................................................ 9, 45, 48, 49, 50, 51

18 U.S.C. § 2320(f)(1)(A) ............................................................. 33, 54

18 U.S.C. § 2320(f)(1)(A)(ii) ............................................................ 35

18 U.S.C. § 2320(f)(1)(A)(iv) ........................................................... 34

18 U.S.C. § 2320(f)(5) ...................................................................... 76

18 U.S.C. § 2320(g) ....................................... 24, 38, 40, 45, 46, 49, 50, 51

18 U.S.C. § 2323 ............................................................................... 80

18 U.S.C. § 2323(a)(1) ...................................................................... 81

18 U.S.C. § 2323(a)(1)(A) ................................................................ 75

18 U.S.C. § 2323(a)(1)(C) ........................................................ 75, 79, 81

18 U.S.C. § 2323(b)(2)(A) ................................................................ 75

18 U.S.C. § 2341(2) .......................................................................... 77

18 U.S.C. § 3231 ................................................................................. 3

18 U.S.C. § 3231(a)(1) ...................................................................... 78

28 U.S.C. § 1291 ................................................................................. 3

28 U.S.C. § 2461(c) .......................................................................... 74

Civil Asset Forfeiture Reform Act of 2000 ................................ 80

PRO-IP Act of 2008............................................................80, 81

Pub. L. 106-185, § 20, 114 Stat. 202 (2000)................................ 81

Pub. L. 109-181, §§ 1(b), 2(b), Stat. 285, 288 (2006) ................. 67

The Lanham Act of 1946 .................................................34, 41

## Other Authorities

Advisory Committee Notes, 1972 Proposed Rules, Fed. R. Evid. 701 ...58

U.S.S.G. § 5K1.1 ..................................................................... 7

## Rules

Fed. R. App. P. 4(b)(1)(A) ............................................................ 3

Fed. R. Crim. P. 32.2(b)(1)(A)......................................83, 84, 85

Fed. R. Evid. 401.............................................................48, 59

Fed. R. Evid. 402.............................................................48, 59

Fed. R. Evid. 403.............................................................61, 62

Fed. R. Evid. 701(b) .............................................................58

Fed. R. Evid. 702(a) ........................................................48, 59

## Constitutional Provisions

U.S. CONST. amend. V...................25, 31, 40, 51, 53, 55, 63, 64, 65, 70, 71

U.S. CONST. amend. VI.................................31, 40, 51, 53

U.S. CONST. amend. XIV ......................................................31

## INTRODUCTION

A remarkably simple concept lies at the center of this otherwise exceedingly lengthy and complex case: A good is only "counterfeit" if it bears a trademark that causes confusion, mistake, or deceives regarding the *origin* of the good.

So, a pair of Nikes is still a pair of Nikes if, for example, the wearer takes a sharpie and draws an extra "swoosh" on the side. But what if the wearer also replaces the Nikes' laces with generic ones, and then draws "swooshes" on those generic laces. Are the shoes still genuine Nikes, or have they become counterfeits?

The facts of this case live in that gray area. The Appellants sold Apple and Samsung cell phones that had been refurbished using aftermarket parts such as backplates, screens, and batteries, and those parts bore "inauthentic" trademarks, *i.e.*, trademarks that were not placed by the trademark holders. Relying on the intuitive concept discussed above, which Congress has codified (albeit clumsily) in 18 U.S.C. § 2320, one of the Appellants' theories at trial was that the phones were genuine but refurbished—not counterfeit.

1

From the outset, however, the Government and district court mistook this as a "trademark case" that required proving only that the trademarks were inauthentic. And although the Appellants eventually managed to convince the district court that their understanding of the law was largely correct, the damage was done. The district court excluded as irrelevant the Appellants' expert testimony that the phones were in fact originally made by Apple and Samsung. It allowed the Government and its witnesses—particularly the "trademark experts" from Apple and Samsung—to repeatedly misuse the term "counterfeit" as a synonym for "inauthentic" mark or a good bearing an inauthentic mark. It failed to properly instruct the jury regarding what did and did not amount to a counterfeit good, and that it is lawful to use packaging bearing "inauthentic" marks to repackage genuine goods. And it constructively amended the indictment by instructing the jury regarding the uncharged offense of conspiracy to traffic in counterfeit labels and packaging.

As a result, the Appellants were unable to put the most important law and evidence before the jury, their defense was fatally undermined,

and their trial was fundamentally unfair. The Court should vacate

Appellants' convictions and remand this case for a new trial.

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction pursuant to 18 U.S.C.

§ 3231. *See* 5-ER-1158–91. This Court has jurisdiction pursuant to 28

U.S.C. § 1291. The district court filed each Appellant's criminal

judgment on either March 22 or March 23, 2023, and every Appellant

filed a timely notice of appeal on March 31, 2023. *See* Fed. R. App. P.

4(b)(1)(A); 1-ER-268–74 and 27-ER-7455–59 (Timofey); 1-ER-275–81

and 27-ER-7452–54 (Pavel); 1-ER-135–41 and 27-ER-7448–51

(Mikhail); 1-ER-142–48 and 27-ER-7445–47 (Piotr); 1-ER-128–34 and

27-ER-7442–44 (David).[1]

## BAIL STATUS

The Appellants are out of custody pending appeal.

---

[1] The judgments were amended on July 16, 2024, modifying only the restitution portion of each. *See* 1-ER-3–10, 1-ER-19–26, 1-ER-35–42, 1-ER-11–18 and 1-ER-27–34.

## ISSUES PRESENTED

I.     Did the district court err by declining the Appellants' proposed instruction defining a "counterfeit mark" as one that is likely to cause confusion, mistake, or to deceive about the origin of a good?

II.    Did the district court err by refusing the Appellants' proposed instruction that it is not a crime to repackage genuine goods not intended to confuse or deceive?

III.   Did the district court err by excluding defense expert Derek Ellington's testimony regarding the origin of the phones?

IV.    Did the district court abuse its discretion by allowing the Government and its witnesses to repeatedly misuse the term "counterfeit" at trial?

V.     Did the district court constructively amend the superseding indictment when it instructed the jury that it could convict the Appellants for conspiracy to traffic in counterfeit labels and packaging separately from any goods?

VI.    Must this Court vacate the Appellants' convictions because the errors in this case cumulatively deprived them of their right to a fair trial?

4

VII.   Did the district court miscalculate the forfeiture money judgments by using an erroneous interpretation of the law and evidence?

## STATEMENT OF THE CASE

### A.    Nature of the Case

This is the consolidated appeal of the convictions of five Appellants for a total of sixteen charges. It was once a ten-defendant case with 51 charges, and was heavily litigated pre-trial, through two months-long jury trials, and during extensive sentencing, restitution, and forfeiture proceedings.

Nine of the defendants were part of the Babichenko family by either blood or marriage: Four brothers and two of their wives, a sister and her husband, and a cousin. Most of them emigrated as children from the former Soviet Union because their Christian families were persecuted. All were U.S. citizens.

The allegations were that they sold "counterfeit" cell phones and accessories on Amazon.com and eBay.com. But as the case unfolded, it became clear that the phones were not "counterfeit" in the traditional (not to mention statutory) sense of the word; they were not manufactured from whole cloth by someone other than the trademark

5

holders. Instead, the phones were genuine Apple and Samsung devices that had been refurbished with aftermarket parts like screens, backplates, and batteries that sometimes bore inauthentic[2] Apple and Samsung marks. The crux of one question for the jury, therefore, was whether those refurbished phones were "counterfeit" under § 2320. Each issue in this appeal, except forfeiture, ties into that question in one way or another.

### B.    Cast of Characters and Places[3]

#### 1.    The Defendants

Pavel ("Paul"[4]) Babichenko: The Babichenko brother with the biggest cell phone sales operation, and who was considered the lead defendant in this case. He is married to acquitted co-defendant Natalya Babichenko.

---

[2] This brief uses the term "inauthentic" to describe a mark that was not placed by the trademark holder. Again, that term is not synonymous with "counterfeit" in § 2320 because a mark—even an inauthentic one— is counterfeit only if it misidentifies the origin of the good to which it is attached.

[3] The following is uncontroverted information.

[4] For clarity, this brief refers to the individual Appellants by their first names. The trial record includes references to both their true and anglicized names.

Piotr ("Peter") Babichenko: Another brother who sold cell phones until transitioning to run a cell phone case company. Peter holds an executive MBA from Oxford.

Timofey ("Tim") Babichenko: Another brother who sold cell phones. He is married to acquitted co-defendant Kristina Babichenko.

Mikhail ("Michael") Iyerusalimets: A Ukrainian refugee who is married to acquitted co-defendant and Babichenko sister Anna Iyerusalimets. He had both a cell phone business and a construction business.

David Bibikov: A cousin to the Babichenkos who also sold cell phones.

Gennady Babitcheko: Another brother, and the only Babichenko with a "t" in his last name. He is a denturist and never worked in the cell phone business. The district court acquitted him in trial one.

Artur Pupko: The only non-relative defendant. He worked for Defendant Paul Babichenko, and was a prolific seller. He pled guilty with a U.S.S.G. § 5K1.1 plea agreement and testified at trial.

7

### 2.    Key Witnesses

The Government called two "trademark experts" and brand protection officers to testify at trial: Leah Caras from Apple, and James Hogg from Samsung.

### 3.    Places

The "Large Warehouse" at 12586 West Bridger Street in Boise, Idaho, had offices and warehouse space. Paul, Peter and Tim had offices there, and it is where Pupko worked.

The "Small Warehouse" at 12554 West Bridger Street was across the alley from the Large Warehouse. This building also had offices and warehouse space. David had an office there, as did Mikhail until he started working from his home's garage.

Neither warehouse had retail or showroom space.

## C.    Course of Proceedings

### 1.    Pretrial Proceedings

In mid-August 2018, the Government filed a 34-count sealed indictment naming ten defendants in this case. 5-ER-1211–38. A week later, law enforcement executed arrest warrants on the defendants and search warrants on their homes and businesses. 5-ER-1202–10. Most were released the next day, a few spent more days or weeks in custody,

8

5-ER-1192–1201, and Paul and Gennady remained in custody for almost a year. 27-ER-7497–98 (Dkt. 289, 293). None of the defendants had a criminal record.

The Government filed a superseding indictment in May of 2019, which charged the defendants with: Conspiracy to commit wire fraud, 18 U.S.C. §§ 1349, 1343; substantive counts of wire fraud, 18 U.S.C. § 1343; substantive counts of mail fraud, 18 U.S.C. § 1341; conspiracy to traffic in counterfeit goods, § 2320(a), (b)(1), (f)(1); substantive counts of trafficking in counterfeit goods, § 2320(a), (b)(1); conspiracy to launder money, 18 U.S.C. § 1956(h); and substantive counts of money laundering, § 1956(a)(1)(B)(i); 18 U.S.C. § 2. 5-ER-1158–91. There were also extensive criminal forfeiture allegations against all defendants. 5-ER-1179–91.

Pupko pled guilty in September 2019, 5-ER-1157, 5-ER-1155–56, and his sentencing was postponed until after the remaining defendants' trial, 27-ER-7517 (Dkt. 568).

## 2. The Trials

The first jury trial, which ran from June 21, 2021 until September 2, 2021, did not result in a single conviction. 4-ER-920–21, 4-ER-883–

9

85. At half time, the court dismissed all charges against Gennady with prejudice, 4-ER-914–15, and the Government dismissed the remaining money laundering charges shortly thereafter, 4-ER-916–19. The jury acquitted Natalya on all counts. 4-ER-870–71. It found Peter, Tim, and David not guilty on a total of five counts, and hung on the others. 4-ER-880–82, 4-ER-875–79, 4-ER-863–65. The jury hung on all counts as to Paul, Kristina, Anna, and Mikhail. 4-ER-872–74, 4-ER-866–69, 4-ER-859–62, 4-ER-854–58.

Seven defendants and a total of nineteen charges proceeded to trial two, which ran from May 18, 2022, to August 1, 2022. 3-ER-726, 3-ER-708–09. The remaining charges included substantive counts of mail fraud, wire fraud, and trafficking in counterfeit goods, as well as conspiracy to commit wire fraud and to traffic in counterfeit goods, labels, and packaging.[5] *See, e.g.,* 4-ER-846 (detailing the defendants and counts remaining after trial one).

Notably, the district court concluded that the allegation that the goods sold by the defendants were "counterfeit" was a part of every

---

[5] As discussed in Issue III, however, the superseding indictment did not actually charge the defendants with trafficking in counterfeit labels and packaging separately from goods.

10

charge in the superseding indictment. 3-ER-710–25. The district court thus instructed the jury that it had to find the items were counterfeit under § 2320 to convict on every count in this case, including the fraud counts. 2-ER-372–444.

The district court granted motions for acquittal as to all or part of Counts 21 and 23 (Paul), Count 28 (David), and Count 30 (Tim) because the government did not offer any evidence that the phones were the models specified in the superseding indictment. 3-ER-674–84. The jury later acquitted Kristina and Anna of all counts, 3-ER-690–93, 697–99, and found Paul, Peter, Tim, David, and Mikhail guilty of all remaining counts, 3-ER-685–89, 694–96, 700–03, 704–05, 706–07.

### 3.   Post-Trial Proceedings

The district court sentenced Pupko to five years of probation and a $10,000 fine. 3-ER-576–77. It imposed terms of incarceration and three years of supervised release on the Appellants. 3-ER-574–75 (Paul, 72 months); 3-ER-572–73 (Peter, 48 months); 3-ER-570–71 (Tim, 48 months); 3-ER-566–67 (Mikhail, two months); 3-ER-568–69 (David, one month). It imposed fines on some of them, 3-ER-574–75 (Paul, $21,000); 3-ER-572–73 (Peter, $10,000); 3-ER-570–71 (Tim, $10,500), and ordered

11

restitution totaling over $300,000, 3-ER-544–65. It entered various preliminary forfeiture orders, including two that are challenged in this appeal. 2-ER-363–71, 1-ER-43–93. The forfeiture money judgments ranged from just under $1,000,000 (Mikhail), to nearly $34,000,000 (Paul). 1-ER-88.

### D.    Statement of Facts[6]

### 1.    Refurbished Phones and the Secondary Market

The Government alleged the conspiracy took place between 2008 and August 2018, but the evidence mainly concerned 2012 on. The phones involved were not new releases but were generally one- to three-year-old models. 11-ER-2858–59; 17-ER-4582–83. They were refurbished in China with some "non-original equipment manufacturer" parts (also known as "non-OEM" or "aftermarket" parts). 11-ER-2776–77, 2781. The parts that could be replaced, and often were, included the screens, batteries, and backplates (for removable batteries). 15-ER-4220.

---

[6] There is simply no good way to succinctly lay out the facts adduced in a two-month-long jury trial. This brief summarizes the broad facts described in the offense conduct section of Tim Babichenko's presentence report (which matches the offense conduct sections of the remaining presentence reports), and gives more detailed explanations and citations from the second trial as needed.

At trial, the defense called digital forensics and mobile device expert Derek Ellington. 21-ER-5750. The district court excluded as not relevant his proposed testimony that the phones (except for the replaceable parts) were manufactured by Apple and Samsung. 2-ER-532–41. He was able to testify, however, about the "operability" of the cell phones in the case. 2-ER-532–41. He was not allowed to turn on the phones by court order; his opinion was based on his inspection of the chips and motherboard in the phones. 21-ER-5767–68, 5772. He opined that the phones would all operate as intended. 21-ER-5805–06, 5811–13.

Rich Helfrich was called as a defense witness with experience in the secondary phone market. 21-ER-5882. He explained that phones have several life cycles and could have as many as four owners. 21-ER-5883. A phone for sale that is a couple years old is likely a secondary-market device. 21-ER-5916–17. Many of those devices come from major phone carriers' trade-in programs, where customers upgrade to the newest model by trading in their old phones. 21-ER-5952. Companies in China often refurbish phones in the secondary market. 21-ER-5906, 5911–12. Apple and Samsung also refurbish cell phones. 21-ER-5917–

13

18. Apple advertises its certified refurbished products to be a like-new device. 21-ER-5921. During the timeframe at issue in this case, replacement Apple parts were not available to the public. 21-ER-5922.[7]

Amazon at the time only offered sellers "new" and "used" categories. 22-ER-6071–74. Amazon records show that approximately 98% of the devices sold through the Appellants' online stores were listed as "new." 22-ER-6071–74; PSR ¶ 72. But they were listed at a refurbished price, which was much less than the newest models. 17-ER-4582–83; 22-ER-6071–74. Peter and Paul therefore testified that they believed the most accurate way to list the refurbished-to-new products was as "new" but at a lower, refurbished price. 22-ER-6071–74; 23-ER-6560; 23-ER-6602. Paul even created a sticker to put on every phone, which explained that a phone's classification as "new" included "unopened new/recertified to new." 23-ER-6416–17; 26-ER-7366 (Tr. 2 Ex. 6166). Amazon eventually updated their categories to include "renewed." 23-ER-6603.

---

[7] By the time of trial, Apple parts were available largely because of the "right to repair" movement. 21-ER-5922.

### 2. Apple and Samsung's Brand Representatives

The Government called two brand representatives and "trademark experts" to testify about the trademarks and superficial characteristics on the phones. During their testimony, the Government and the witnesses used the term "counterfeit" to refer to an "inauthentic" mark, or a good bearing an inauthentic mark. *See infra,* Issue IV.

James Hogg of Samsung testified that he could determine whether a product contains a genuine Samsung trademark. 15-ER-3959, 3970–71. He looks for things like missing features, print quality and whether the edges of the mark are sharp and clean, the spacing between letters, and how sharp the peaks and valleys are in the letters. 15-ER-3974, 3981–82. He brought a magnifying glass to review the trademarks and print because some assessments turn on very fine distinctions. 15-ER-3978. Based on his superficial examination of the exterior of the devices, and the trademarks in particular, Hogg testified that almost all the Samsung phones, accessories, batteries, and packaging in this case were "counterfeit."

Leah Caras of Apple testified that she knows what a genuine Apple trademark looks like and where it is supposed to appear on a

15

product. 15-ER-4215; 16-ER-4243. Like Hogg, she looks at fine details, like the print quality, style of writing, and where on the product the mark appears, to determine authenticity. 16-ER-4248. On some products she examined, she said the "bite" of the apple mark wasn't big enough, and on others the letter spacing wasn't correct. 16-ER-4251, 4254. For example, two spaces (not one) should separate "Designed by Apple in California" from "Assembled in China" 16-ER-4260, 4262–63. She also brought a magnifying glass to court and said that some of the exhibit pictures were taken with a microscope. 16-ER-4249, 4266. Caras reviewed over one-thousand items in this case, and she opined that all were "counterfeit," except for ten or less that were undetermined. 16-ER-4281.

### 3. The Investigation

The investigation into this case started with Vadim Dmitruk, an unrelated seller of phones. Homeland Security began investigating Dmitruk in 2013 related to purportedly counterfeit products, 9-ER-2259, and the FBI got involved in 2015 after Dmitruk was arrested for

trafficking in heroin.[8] Dmitruk began cooperating and worked as a confidential human source for the FBI. 6-ER-1430–31. Dmitruk told the FBI about cell phones and the Babichenkos. 6-ER-1431–32; 7-ER-1730; 8-ER-1964. He said the phones were not fake, but claimed the Babichenkos were laundering money. 7-ER-1730; 8-ER-1964. From then on, the FBI and HSI worked the case together. PSR ¶ 63; 6-ER-1432.

The substantive counts came from a series of controlled buys between March 2016 and December 2017. PSR ¶¶ 64–68. The first batch of devices were purchased from the Appellants' storefronts on Amazon.com and eBay.com (wire fraud) and delivered by mail or interstate commercial carrier (mail fraud). PSR ¶¶ 64–68. Many of the devices were listed as "new" Apple or Samsung products. PSR ¶¶ 64–68. Between October 2016 and January 2017, the FBI also had Dmitruk make hand-to-hand purchases from David and Paul. PSR ¶ 66; 6-ER-1434–35, 7-ER-1799. 7-ER-1694–95.

The weekend before the Monday takedown, agents served a package warrant and seized the defendants' packages that were ready for mailing through the U.S. Postal Service. 6-ER-1440–41. That

---

[8] It is undisputed that the defendants had nothing to do with drugs.

17

included 2,451 packages containing 2,669 electronic devices, which were sent by eleven different businesses with ten different return addresses. PSR ¶ 71.

During the search of both warehouses and the defendants' homes, agents seized over 100,000 devices. 6-ER-1438, 1440; PSR ¶ 69. The searches also turned up employment and Secretary of State records, filing cabinets and tax forms, and a generally organized office space. Law enforcement did not find guns, drugs, counterfeit passports, or "go bags." 8-ER-1935–36. The lead FBI agent admitted he was pleasantly surprised that the defendants seemed to be nice people living in homes with families and the like, 8-ER-1955–56, and that the agents "had a different idea in our head of how [the defendants] were going to be." 8-ER-1935.

### 4.    The Defendants' Business Operations

The defendants owned over one-hundred entities, which were limited liability corporations registered with the Secretary of State of Idaho. PSR ¶ 61; 6-ER-1435–36, 1446; *see, e.g.*, 26-ER-7367–69 (Tr. 2 Ex. D-1600). It only took $100 to register an LLC. 6-ER-1435–36. Not all of the companies were open at the same time. 8-ER-2019. Some

18

defendants tended to have multiple businesses with slightly different names, as well as multiple addresses. PSR ¶ 61; 6-ER-1447.

The defendants had so many businesses due to Amazon shutdowns. PSR ¶ 61. Peter testified that a seller needs to have more than one Amazon account, even though it is against Amazon's rules, because if Amazon shuts down an account it also holds the seller's payments and inventory. 22-ER-6077–78. David Howell, a brand protection expert called by the defense, agreed. 24-ER-6723. Having multiple entities allows a seller to do business as another company if the seller's Amazon account is shut down because of customer complaints. 24-ER-6723. Although Amazon's terms and conditions limit one seller to one storefront, Howell acknowledged that most third-party sellers have multiple storefronts for redundancy purposes because no one truly knows why Amazon shuts stores down. 24-ER-6723.

During the course of the alleged conspiracy, various people worked for the defendants in various capacities. For example, the "testers" tested the phones to make sure they worked, and then packaged them for shipment. 6-ER-1446. Some sellers, referred to as "six percenters," opened an Amazon.com account and bank account, and then were given

19

mailing addresses for their individual companies. They kept six percent of the payments they received from Amazon for their sales, and deposited the rest into the employer's account. The employees were directed as to what items to sell and for how much, and how to list them in their store. PSR ¶ 62; 6-ER-1445. Some employees worked for several of the defendants over time. *See, e.g.*, 26-ER-7371 (Tr. 2 Ex. D-2002); PSR ¶ 62.

The Government calculated that between about 2012 to 2018, the defendants received gross monetary deposits from their Amazon accounts ranging from a high of $36,206,982 (Paul) to a low of $3,304,627 (David). PSR ¶ 74. But this was a high volume, low profit margin business. Just the total foreign wires sent by the defendants to their suppliers ranged from $27,380,915.65 (Paul) to $2,419,302 (David). 26-ER-7273–7303 (Tr. 2 Exs. 1258–1262). The Government also calculated that the amount each Defendant deposited into personal accounts from about 2010 through 2018 ranged from $3,626,109 (Paul) to $349,285 (Mikhail), although that was not necessarily income. 13-ER-3609–11; 26-ER-7268–72 (Tr. 2 Ex. 1250).

20

### 5.    Other Trial Issues

Aside from whether the devices were counterfeit, other contested issues in this case included whether the defendants knew the devices were counterfeit and whether they conspired together.

As for knowledge, the Government introduced evidence to show that the defendants had notice that others believed the devices were counterfeit (albeit using their own definition of that term). For example, the defendants received 34 "notices of seizure" from U.S. Customs claiming the products they were importing were counterfeit, PSR ¶ 70; various defendants received cease and desist letters from the manufacturers, 15-ER-3967–70; 16-ER-4242; some customers complained that the products did not work properly or were not authentic, PSR ¶ 70; 13-ER-3423–24, 3454–56; 14-ER-3705–06; 6-ER-1507–08; 9-ER-2297; and Amazon sometimes shut down the defendants' Amazon accounts for reasons such as inauthentic products, 6-ER-1509.

The defendants submitted various responses to U.S. Customs over the years, with little luck. *See, e.g.*, 10-ER-2551–54 (Paul responding that the phones were refurbished); 22-ER-6063–67 (Peter twice successfully challenging the seizures by hiring an attorney). Peter

21

testified that the vast majority of shipments—hundreds or thousands—were not seized, so the seizures became a cost of doing business. 22-ER-6061, 6067. Although most of the defendants' customers were happy with their purchases, the defendants offered replacements or refunds to unhappy customers. 13-ER-3442, 3458; 14-ER-3712; *see, e.g.*, 24-ER-6677–79 (three of Artur Pupko's companies had feedback ratings of between 98% to 97%). And the defendants responded to the Amazon shutdowns by providing explanations and action plans, or sending invoices created by them purporting to represent purchases of genuine Samsung and Apple goods from co-defendants' businesses. PSR ¶ 70; 6-ER-1509–13; 7-ER-1676–81; 8-ER-1855.

Finally, the defendants also disputed the conspiracy allegations. The Government presented evidence that the defendants shared information, purchased inventory from each other, used the same suppliers in China, worked in the same place, hired each others' employees at different times, and used the same language to respond to shut down letters from Amazon. PSR ¶ 73. The defendants countered that, while there was expected familial cooperation, they were actually competing against each other. 22-ER-6085–86; 23-ER-6547. David

asserted that he was off doing his own thing, had his own sources of supply, and sold his phones as he saw fit. 17-ER-4630.

## SUMMARY OF THE ARGUMENT

One of the Appellants' defenses at trial was that they sold refurbished genuine Apple or Samsung phones which had the backplate, screen, or battery replaced. Accordingly, the phones were not "counterfeit" because Apple or Samsung made the phones originally, even if the trademark on a non-essential replacement part was not placed there by the trademark holder. The Appellants tried to get this defense to the jury multiple times in many different ways, but they were thwarted by the district court's rulings.

I.      The district court erred by denying the Appellants' jury instruction that defined "counterfeit mark" to expressly tie the mark to its tendency to mislead about the *origin* of the good itself. Because § 2320 criminalizes trafficking in counterfeit *goods*, not merely goods bearing inauthentic marks, this instruction was necessary to correctly and clearly state the law for the jury. And because this instruction was necessary for the Appellants to present a complete defense, the district court in turn deprived them of that right.

23

II.    The district court erroneously refused to instruct the jury on a "repackaging defense" under § 2320(g). That subsection removes from criminal liability the "repackaging of genuine goods or services not intended to deceive or confuse." *Id*. The court mistakenly concluded that, because the phones had been modified, they could not be "genuine" repackaged goods as a matter of law. But that was a factual determination reserved for the jury, not a question of law to be decided by the district court. The instruction accurately stated the law, was supported by the evidence, and was necessary for the Appellants to present a complete defense.

III.   The district court erred by excluding as irrelevant defense expert Derek Ellington's testimony regarding the origin of the phones. Contrary to the district court's conclusion, this is not a trademark case but a counterfeit goods case. And a good is only counterfeit if it bears a mark that incorrectly identifies the origin of the good. Ellington's origin testimony was therefore not just relevant, but indispensable, to whether the Appellants sold "counterfeit goods" and repackaged genuine goods. By excluding that testimony, the district court deprived the Appellants of their right to a fair trial and to present a complete defense.

24

IV.    The district court abused its discretion by allowing the Government and its witnesses to repeatedly misuse the term "counterfeit" as a synonym for an "inauthentic" mark or a good bearing an inauthentic mark. The misuse of that term was not helpful, it invaded the province of the jury, and it was unfairly prejudicial and confusing. Because the counterfeit determination was central in the case, and the Government's misuse of the term was rampant, this error deprived the Appellants of their right to a fair trial.

V.    The district court constructively amended the superseding indictment, in violation of the Fifth Amendment, when it instructed the jury on the uncharged offense of conspiracy to traffic in counterfeit labels and packaging. Section 2320(a)(1) criminalizes the trafficking of counterfeit goods, and § 2320(a)(2) criminalizes the trafficking of counterfeit labels and packaging. Labels and packaging are thus not themselves "goods." The superseding indictment charged the Appellants only with conspiracy to traffic in "counterfeit goods," and the references to labels and packaging in the caption and "to wit" clause did not add to that charge but merely described it.

25

VI.     The cumulative effect of these errors deprived the Appellants of their due process right to a fair trial. Each error went to the central question of whether the goods were counterfeit, and thwarted the Appellants' ability to put the law and evidence supporting their theory of defense to the jury. The trial errors, both individually and cumulatively, require the Court to vacate the judgments and remand for a new trial.

VII.    Finally, the district court imposed excessive forfeiture money judgments. It erroneously concluded that gross proceeds, rather than net proceeds, are forfeitable. And it clearly erred by including sales for non-indicted brands to establish the percentage of counterfeit goods sold. This Court should therefore reduce the forfeiture money judgments.

## ARGUMENT

**I.    The district court erred by declining the Appellants' proposed instruction defining a "counterfeit mark" as one that is likely to cause confusion, mistake, or to deceive about the origin of the good.**

### A.    Introduction

Section 2320(a)(1) criminalizes trafficking in counterfeit goods. A person is guilty of trafficking in counterfeit goods when he or she knowingly uses a "spurious" mark on or in connection with the good, and the use of the mark is likely to confuse, cause a mistake, or deceive others about the origin of the good. The gravamen of the offense is that a person has knowingly used a mark that falsely implies that the holder of that trademark manufactured the good when the holder did not. The Appellants requested jury instructions to reflect as much, but the district court declined to adopt their proposed instruction. The court erred, and the Appellants were deprived of their constitutional right to present a complete defense. This Court must vacate the judgments and remand for a new trial.

### B.    Background

A central disagreement between the Government and the Appellants in this case was over the reach of the trafficking in

27

counterfeit goods statute. The Government has taken the position that § 2320(a) sweeps broadly and criminalizes trafficking in goods, labels, and packaging that bear an inauthentic trademark. *See*, *e.g.*, 4-ER-951, 955–56, 1077, 1112–13. In the Government's view, the analysis begins and ends with the authenticity of the trademark itself.

The Appellants, in contrast, have urged that a mark is a "counterfeit mark" only if the mark is also likely to confuse or deceive others *about the origin of the item* to which the mark is associated. Misleading others about the original maker of the product—and not just about the authenticity of the mark itself—is critical, as the statute criminalizes trafficking in counterfeit *goods*.

Counsel for one of the defendants summarized the defense theory aptly in her closing argument. 25-ER-7074. There, she analogized the facts to a hypothetical situation in which she had bought a genuine Nike bag, but the zipper eventually broke, and the Nike logo then fell off. In her hypothetical, she asked her aunt, a seamstress, to replace the zipper and to make up a replica Nike logo and put it on the bag. "Nike didn't make the logo, but Nike made the bag and that is not a counterfeit bag." 25-ER-7074. That is so because while the mark may

28

not have been authentic, the good itself was. There would be no deception about the origin of the good.

Accordingly, the Appellants requested that the jury instructions define "counterfeit mark" to clearly and expressly tie the mark that was used to its tendency to mislead about the origin of the good itself:

> A "counterfeit mark" is one that is "spurious," *meaning it falsely suggests an erroneous origin of the good it is used on or connection with*. To find that a mark is counterfeit, you must find beyond a reasonable doubt that:
>
> (i) it was used in connection with trafficking the good or goods named in the Count at issue;
> . . . .
> (iv) its use is likely to cause confusion, to cause mistake, or to deceive regarding *the origin of the good that it is used on or connection with*.

2-ER-497, 500, 505 (emphasis added);[9] *see also* 2-ER-471, 474.

The district court did not adopt the proposed instruction. 24-ER-6787, 6789–90. It instead chose to list "spurious" as a separate element of what makes a "counterfeit mark." 2-ER-414. And while it did include language regarding the origin of the good as part of its definition of

---

[9] Again, because the superseding indictment alleged that the Defendants committed fraud by selling "counterfeit" goods as new and genuine, the district court included the definition of a counterfeit good in the fraud instructions.

29

"spurious," it did not include the same limiting language as to the last element about leading to confusion, mistake, or deception. Its final Instruction No. 33 reads, in part:

> A "counterfeit mark" is a mark that is:
>
> (1) "spurious"—meaning that it is false or inauthentic, in that it deceptively suggests an erroneous origin of a good;
>
> (2) used in connection with trafficking in any goods;
> . . . .
> (5) likely to cause confusion or mistake, or to deceive, when used.

2-ER-414.

The Appellants objected to the instruction, arguing that "spurious" was not a separate element. A "counterfeit mark" is, by definition, a "spurious mark" that has four additional elements under the statute. 3-ER-763. The Appellants also contended that the court needed to include the language about how the mark was used in a way to "cause confusion, cause mistake, or deceive regarding the origin of the good it is used on or in connection with." *Id.*

## C.   Legal Standards

### 1.   Standard of Review

This Court reviews de novo both the refusal to give a defendant's jury instruction based on a question of law, *United States v. Eshkol*,

30

108 F.3d 1025, 1028 (9th Cir. 1997), and whether a jury instruction misstates an element of a crime, *United States v. Dearing*, 504 F.3d 897, 900 (9th Cir. 2007).

The Court reviews the district court's findings on whether a defendant's theories are factually supported for an abuse of discretion. *United States v. Gomez-Osorio*, 957 F.2d 636 (9th Cir. 1992).

## 2.   Right to Present a Defense

The Fifth and Sixth Amendments guarantee a defendant the meaningful opportunity to present a complete defense. *California v. Trombetta*, 467 U.S. 479, 485 (1984) (interpreting the right as applied under the Fourteenth Amendment). A district court's failure to correctly instruct the jury on the defense theory deprives the defendant of his or her due process right. *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002). The right to a complete defense "would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense." *Id*. (citation omitted).

For that reason, "a defendant is entitled to instructions relating to a defense theory for which there is *any* foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of

31

doubtful credibility." *United States v. Wofford*, 122 F.3d 787, 789 (9th Cir. 1997) (emphasis added), *as amended* (Aug. 21, 1997). "A mere scintilla of evidence supporting a defendant's theory, however, is not sufficient to warrant a defense instruction." *Id*. (internal citations and quotations omitted).

### D.   Argument

Section 2320 is not a model of clarity. But "[i]t is axiomatic that criminal statutes . . . are to be strictly construed; and that in doubt as to the law, [the Court] should follow the rule of lenity." *United States v. Ryberg*, 43 F.3d 1332, 1334 (9th Cir. 1995). Under the rule of lenity, courts must "limit the reach of criminal statutes to the clear import of their text and construe any ambiguity against the government.'" *United States v. Millis*, 621 F.3d 914, 916–17 (9th Cir. 2010) (quoting *United States v. Romm*, 455 F.3d 990, 1001 (9th Cir. 2006)).

Under § 2320(a)(1), "[w]hoever intentionally . . . traffics in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services . . . or attempts or conspires to [do so]" is guilty of trafficking in counterfeit goods or services. This Court has previously determined that the essential elements of the crime are that

32

"the defendant: (1) trafficked in goods or services; (2) intentionally; (3) used a 'counterfeit mark' on or in connection with these goods or services; and (4) knew the mark was counterfeit." *Wang v. Rodriguez*, 830 F.3d 958, 961 (9th Cir. 2016).

But "counterfeit mark" is further limited to certain specific circumstances and uses that are spelled out in the statute:

> (A) a spurious mark—
>
>> (i) that is used in connection with trafficking in any goods [or] services . . . ;
>>
>> (ii) that is identical with, or substantially indistinguishable from, a mark registered on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered;
>>
>> (iii) that is applied to or used in connection with the goods or services for which the mark is registered with the United States Patent and Trademark Office . . . ; and
>>
>> (iv) the use of which is likely to cause confusion, to cause mistake, or to deceive.

§ 2320(f)(1)(A).

Although subsection (iv) gets close to the heart of the matter, it does not expressly say *what the confusion, mistake, or deception must be*

33

*about*. The rule of lenity and case law (not to mention common sense)

fill in that gap.

The criminal statute was modeled on the civil Lanham Act. *United*

*States v. Hon*, 904 F.2d 803, 805 (2d Cir. 1990). The Lanham Act

includes identical language as § 2320(f)(1)(A)(iv) about how a mark

must cause confusion in the marketplace. *Id*.; *see also* 15 U.S.C.

§ 1114(1)(a). This Court has held in a Lanham Act case that the test for

likelihood of confusion is "whether a reasonably prudent consumer in

the marketplace is likely to be confused about the *origin of the good* or

service bearing one of its marks." *Dreamwerks Production Group, Inc. v.*

*SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) (emphasis added);

*see also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,

543 U.S. 111, 117 (2004) (noting that it is a plaintiff's burden to show in

a Lanham Act case "that the defendant's actual practice is likely to

produce confusion in the minds of consumers about the origin of the

goods or services in question.").

The Appellants' interpretation that the statute criminalizes

counterfeit products and not inauthentic marks on genuine products is

further supported by one of the additional elements of what makes a

34

mark counterfeit. Under § 2320(f)(1)(A)(ii), the spurious mark must be "identical with, or substantially indistinguishable from" the trademark holder's real mark that is registered with the Patent and Trademark Office. The only way that language makes sense is if one understands that the aim of the statute is to target inauthentic *goods* not just inauthentic *marks*. It is the inauthentic good attached to a very real looking mark that deceives the public.

The Appellants' proposed instruction tracked the law, narrowing the object of the confusion to the origin of the good. The instruction was consistent with the Appellants' theory of defense that the phones were authentic Samsung and Apple products that had been refurbished with aftermarket non-essential parts.

It is true that the district court included somewhat similar language in its definition of "spurious mark" in Instruction No. 33. 2-ER-413. There, it defined "spurious" as "meaning that it is false or inauthentic, in that it deceptively suggests an erroneous origin of a good." *Id*. But it separated "spurious" as its own element of counterfeit mark, when it is not a separate element in the statute, and it failed to

35

explain that the "confusion" element of the statutory subsection (iv) was regarding the origin of the good.

This Court must consider "whether the instructions—taken as a whole and viewed in context of the entire trial—were misleading or confusing, inadequately guided the jury's deliberations, or improperly intruded on the fact finding process." *United States v. Warren*, 25 F.3d 890, 898 (9th Cir. 1994) (citation omitted).

Such a review should lead this Court to find that the district court's mere embedding of "suggests an erroneous origin of a good" to define "spurious mark" was too little, too late, and did not cure its error in rejecting the Appellants' instruction as a whole. The Government made this case enormously complex for the jury, trying seven defendants for dozens of criminal counts, including mail and wire fraud, trafficking in counterfeit goods, and conspiracy, over 37 days of trial. The charges spanned years, thousands of transactions, and so many physical exhibits that they were stored in warehouses. The jury instructions, including the verdict forms, were 73 pages long and include esoteric and difficult to understand terms.

36

More to the point, the record is replete with the district court and the Government's misunderstanding as to the import of the origin of the internal parts of the phones to defeat counterfeit trafficking charges. In closing argument, the Government expressly focused on the trademarks, pointing to its trademark experts, and calling the items "counterfeit" solely because the *marks* were inauthentic. 24-ER-6879–80.

The district court's instructions on this issue were confusing, misleading, and did not cure its error in declining to adopt the Appellants' proposed instruction. The error deprived the Appellants of a jury instruction consistent with their theory of defense, and the Government will be unable to show it is harmless. *See Chapman v. California*, 386 U.S. 18, 23–24 (1967). The error is magnified by the district court's failure to allow defense expert Ellington to testify to the origin of the phones, its failure to grant the Defendants' motion in limine to prohibit conclusory assertions that items were "counterfeit," and its refusal to instruct the jury to consider a repackaging defense. The Court should remand.

37

## II.    The district court erred by refusing the Appellants' proposed jury instruction that it is not a crime to repackage genuine goods not intended to confuse or deceive.

### A.    Introduction

Section 2320(g) provides that it is not unlawful to repackage "genuine goods or services not intending to deceive or confuse." Consistent with their theory of defense that they repackaged Apple and Samsung phones for resale, the Appellants requested a jury instruction based on § 2320(g). The district court overruled that request after concluding that the goods at issue were not "genuine" as a matter of law. That should have been a question of fact for the jury to decide, not a question of law for the district court. The proposed instruction accurately stated the law, it was supported by the facts, and the district court's failure to give it deprived the Appellants of their right to present a complete defense. The Court must vacate the convictions and remand for a new trial.

### B.    Background

As discussed above, a key component of the Appellants' theory of defense was that a genuine Apple or Samsung phone does not become counterfeit when its backplate, for example, is replaced with an

38

aftermarket part bearing an inauthentic Apple or Samsung trademark.
To that end, they requested instructions that would have put a
"repackaging defense" to the jury:

> If you find that a Count involves what is otherwise a
> counterfeit mark used on or in connection with the
> repackaging of a genuine good, you must return a verdict of
> not guilty unless the government also proves beyond a
> reasonable doubt that the defendant used the mark with the
> intent to deceive or confuse regarding the origin of the good.

2-ER-497, 500, 505; *see also* 2-ER-471, 474.

The district court effectively decided this issue when it limited the
scope of Ellington's testimony. 2-ER-540; *see also* 24-ER-6787, 6789–90;
*infra*, Issue III. The court accepted the Government's framing that the
phones had been modified to such an extent that they could not, as a
matter of law, be "genuine goods." *Id*. Because they could not be
"genuine goods," according to the court, a repackaging defense was not
available. *Id*.

## C.   Legal Standards

### 1.   Standard of Review

This Court reviews the rejection of a jury instruction based on a
legal question de novo. *Eshkol*, 108 F.3d at 1028. It reviews the district

court's findings on whether a defendant's theories are factually

supported for an abuse of discretion. *Gomez-Osorio*, 957 F.2d at 642.

### 2.    Right to Present a Defense

A defendant has a Fifth and Sixth Amendment right to present a

defense, *see, e.g.*, *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), and

"is entitled to instructions relating to a defense theory for which there is

any foundation in the evidence . . . ." *Wofford*, 122 F.3d at 789; *see also*

*supra* pp. 31–32.

### D.    Argument

Section 2320(g) immunizes from criminal liability the

"repackaging of genuine goods or services not intended to deceive." The

district court decided that the phones in this case were not "genuine" as

a matter of law because the evidence tended to show that certain basic

components of the phones had been replaced. 2-ER-532–41. Whether

the devices at issue in this case were "genuine goods" was a question of

fact that should have gone to the jury.

In support of its conclusion, the district court distinguished *United*

*States v. Hanafy*, 302 F.3d 485 (5th Cir. 2002); 2-ER-539–40. In *Hanafy*,

the defendants had purchased individual cans of baby formula and then

repackaged the formula into trays that bore the manufacturer's

trademarks for resale to wholesalers. *Id*. at 486. The formula came from the manufacturer, but the Government alleged that the defendants had put inauthentic trademarks on the trays and mislabeled them. *Id*. The jury convicted, but the Fifth Circuit affirmed the trial court's decision overturning the convictions after finding that "§ 2320 was intended to prevent trafficking in goods that were similar to but different than goods normally associated with the mark." *Id*. at 488.

The Fifth Circuit reasoned that, as a criminal statute, § 2320 should be more narrowly construed than the Lanham Act. *Hanafy*, 302 F.3d at 488. It held that "attaching a mark to trays containing the genuine unadulterated, unexpired products associated with that mark does not give rise to criminal liability." *Id*. at 489.

*Hanafy* supports the Appellants' arguments in this case because it focuses—correctly—on the origin of the good rather than solely the authenticity of the trademark.

The district court rejected the Appellants' reliance on *Hanafy*, in part, by drawing a distinction between the infant formula, which it wrote "had not been altered in any way," and the phones at issue here. 2-ER-539. True enough, but there are degrees of alteration, from a

41

complete rebuild of all major parts to minor cosmetic fixes to something in between. What the district court missed in this case was that *Hanafy* was on appeal from a directed verdict in favor of the defendants because the undisputed facts were that the formula was unaltered. The Appellants here were not asking for dismissal or a directed verdict in their favor based on a finding that the phones were "genuine" as a *matter of law*. They were simply asking that they be allowed to present this defense to the jury, and to let it decide the issue.

The issue presents obvious questions of fact for a jury. The evidence at trial suggested that the Appellants' suppliers changed basic items like screens, backplates, and batteries. Ellington was prepared to testify that the core components of the phones were genuine Apple and Samsung products. And he did testify that the phones would function as intended. So, were the modified phones still "genuine"? How much modification would no longer make them "genuine"? These were issues for the jury to decide, and the trial court erred by infringing on the role of the jury.

In conjunction with the limitation on Ellington's testimony, the district court's ruling on this issue deprived the defendants of their

42

right to present a complete defense. The Government cannot show,

beyond a reasonable doubt, that the error did not contribute to the

verdicts. *See Chapman*, 386 U.S. at 23–24. The Court should remand

for a new trial.

## III. The district court erred by excluding defense expert Derek Ellington's testimony regarding the origin of the phones, and the Government will be unable to prove that constitutional error was harmless beyond a reasonable doubt.

### A. Introduction

The district court excluded Ellington's testimony regarding the

origin of the phones because it believed that testimony was not

relevant. To the contrary, that testimony was relevant to all but a

handful of the charges because a good is only counterfeit if the mark it

bears misidentifies *the origin* of the good. The district court erred by

concluding otherwise. Further, Ellington's testimony was necessary for

the Appellants to present a complete defense and receive a fair trial,

and the Government will be unable to prove the error was harmless

beyond a reasonable doubt. This Court must vacate the judgments and

remand for a new trial.

43

## B.  Background

To disprove the core contention that the Appellants sold

"counterfeit" phones, they sought to present Derek Ellington's expert

testimony that the phones were genuine but refurbished Apple and

Samsung products. *See* 5-ER-1139–44; 5-ER-1145–54; 4-ER-1130–36; 4-

ER-1056–63. Ellington is a certified forensic examiner and e-discovery

specialist with twenty years of experience in digital forensics, fraud,

and investigation. 4-ER-1131.

From his review of the Government's discovery and the seized

phones, he opined that the phones were manufactured by Apple or

Samsung, and at most had some cosmetic components replaced. 4-ER-

1131–33. "Apple IOS and Samsung Android operating systems utilize

sophisticated digital technology that render it extremely difficult to

replicate a device, replicate its components or to replace components

with non-genuine components." 4-ER-1133. Ellington did not believe

non-Apple processors and chips could be put together "to have the same

functionality as an iPhone enough to fool Apple, the consumer, and the

[cell] network." 4-ER-1016–17 (testimony at the *Daubert* hearing). "I

have never seen it; *it doesn't exist; I don't believe from a technical*

44

*standpoint it's possible*. And in this particular case, the devices that I reviewed, I saw nothing to change that opinion." 4-ER-1016–17 (emphasis added); *see also* 4-ER-990–93, 997–98, 1011–12.

The Appellants argued this testimony was relevant because the phones were only "counterfeit" if the marks—even "inauthentic" marks not placed by the trademark holders—incorrectly identified the *origin* of the phones. 4-ER-976–79, 981–82. And, if the phones were not "counterfeit" under § 2320(a)(1) and (f)(1), then any packaging and labels that the Appellants used or intended to use to repackage the phones was likewise not counterfeit under § 2320(a)(2) and (g). 4-ER-979–81. Ellington's expertise allowed him to determine whether and what parts of the phones were made by Apple and Samsung, regardless of superficial indicators such as trademarks, color, or font. 4-ER-981–82. Ellington's origin testimony was thus relevant to whether the Appellants violated § 2320.

The Government objected on relevance, 4-ER-951–65, 1075–81, 1103–29, and the district court granted the motion in part. 2-ER-532–41. It found that Ellington was qualified, his opinion was reliable, and his testimony that the phones "functioned" was relevant to show the

45

Appellants unknowingly sold "really good counterfeits." 2-ER-536–37,

541 (citation omitted).

But it did not believe that Ellington's origin testimony was

"particularly relevant to whether the phones in this case were 'genuine'

within the meaning of 18 U.S.C. § 2320(g)." 2-ER-536. Ellington freely

admitted he was not a trademark expert and he does not "have much to

offer with respect to the trademark claims." 2-ER-538. "[F]rom his

viewpoint, the term 'counterfeit' . . . focus[es] on the actual technology

and not the trademarking and packaging." 2-ER-538. The district court

went on to explain:

> [The] defendants are advancing a theory that the rebuilt,
> non-cloned phones in the case are "genuine." And . . . that
> they did nothing more than repackage "genuine goods" . . .
> But refurbished or rebuilt phones aren't "genuine" phones
> within the meaning of § 2320(g). . . .

2-ER-538–40. It therefore excluded testimony regarding the phones'

origin. *See* 20-ER-5736–38; 21-ER-5741–47.

In closing, the Government capitalized on the absence of origin

testimony while misstating the law and misconstruing the Appellants'

theory of the case. The prosecutor claimed Ellington's expertise,

> was limited only to whether or not the phone worked. . . .
> he's not a trademark expert. He can't make a determination

46

as to whether or not any trademark is genuine. . . . As to functionality, of course counterfeit products work. It wouldn't be a very good counterfeit if it didn't turn on, if it didn't operate, and that's not what the law requires.

24-ER-6856–57; *see also* 24-ER-6880, 6889; 25-ER-7152–53. She reminded the jury: "You heard from Leah Caras that over 99 percent of the items that she reviewed were counterfeit." 24-ER-6879. "Jim Hogg testified that a small number were genuine, but well over 90 percent were counterfeit." 24-ER-6880. And she claimed, "[t]here is no question that the marks are counterfeit. . . . Apple and Samsung didn't make these trademarks. *They didn't make these products* or apply their trademark." 24-ER-6855 (emphasis added).

## C.   Legal Standards

### 1.   Standards of Review

This Court generally reviews the admissibility of expert testimony for an abuse of discretion. *See United States v. Johnson*, 875 F.3d 1265, 1280 (9th Cir. 2017). But where, as here, Appellants challenge the legal conclusions underpinning the district court's decision, including the interpretation of a statute, this Court's review is de novo. *United States v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018); *United States v. Durham*, 464 F.3d 976, 981 (9th Cir. 2006).

47

## 2.     Expert Testimony

An expert may testify in the form of an opinion if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Before allowing expert testimony, the district court must perform a gatekeeping role to ensure the testimony is reliable and relevant. *United States v. Valencia-Lopez*, 971 F.3d 891, 897–98 (9th Cir. 2020). "Relevancy simply requires that the evidence logically advance a material aspect of the party's case." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (cleaned up); *see also* Fed. R. Evid. 401, 402.

## D.     Argument

### 1.     The district court erred by excluding Ellington's origin testimony as irrelevant.

Ellington's origin testimony was relevant to the core question in this case: Whether the goods, labels, and packaging were "counterfeit" under § 2320.

First, it was relevant to whether the Appellants sold "counterfeit goods" under § 2320(a)(1) and (f)(1). As explained above, a good is only counterfeit if the trademark used on or in connection with the good

48

*misidentifies the origin of the good. See supra*, Issue I; *see also Dreamwerks*, 142 F.3d at 1129; 2-ER-414. Thus, the origin of the good is necessary to determine whether the mark and good are "counterfeit" under § 2320(a)(1) and (f)(1).

Second, Ellington's authenticity testimony was relevant to whether the Appellants sold "counterfeit labels and packaging" under § 2320(a)(2). Just as with goods, labels and packaging are only "counterfeit" if they are "likely to cause confusion, to cause mistake, or deceive." § 2320(a)(2), (f)(1); 2-ER-414, 417. And that confusion or deception only arises if the labels and packaging misidentify the origin of the goods that they will be used on or in connection with.

Third, Ellington's origin testimony was relevant to whether the Appellants lawfully repackaged genuine goods under § 2320(g). Although § 2320 does not define "genuine," it does define "counterfeit." Reading the statute as a whole, "genuine" under § 2320(g) must be the opposite of "counterfeit" under § 2320(a)(1) and (f)(1). *See United States v. Williams*, 659 F.3d 1223, 1225 (9th Cir. 2011) (the Court "examine[s] not only the specific provision at issue, but also the structure of the statute as a whole" to determine its meaning) (citation omitted). The

49

jury could therefore only determine if the Appellants were entitled to a repackaging defense under § 2320(g) if it first determined whether the goods were counterfeit under § 2320(a)(1) and (f)(1). *See supra*, Issue II.

It follows that the district court erred by excluding Ellington's origin testimony. The district court misinterpreted the whole of § 2320, mistakenly focused on the repackaging defense in § 2320(g), misconstrued § 2320(g), and decided a question reserved for the jury.

To begin, the district court mistakenly believed that Ellington's testimony was not relevant to the "trademark claims" because he was not a "trademark expert[]." 2-ER-537. To be clear, these were not "trademark" claims; the Appellants were charged with trafficking in *counterfeit goods*. 5-ER-1158–91. And to determine whether the goods were counterfeit, the jury had to determine whether the trademarks misidentified *the origin* of the goods to which they were attached. *See* § 2320(a)(1), (f)(1); 2-ER-414. Thus, the origin of the goods was not merely "relevant," but crucial to the determination of the core questions in this case.

Next, the district court overlooked entirely that Ellington's testimony went to the main issue of whether the goods were *counterfeit*

under § 2320(a)(1) and (f)(1), and instead myopically focused only on

whether that testimony was relevant to a repackaging defense under

§ 2320(g). *See* 2-ER-538–40.

Finally, the district court misconstrued § 2320(g), and in turn

decided a question reserved for the jury, when it concluded that

Ellington's testimony was not relevant to a repackaging defense

because "refurbished or rebuilt phones aren't 'genuine' phones within

the meaning of § 2320(g)." 2-ER-538. "Genuine" under § 2320(g) is the

opposite of "counterfeit" under § 2320(a)(1) and (f)(1). And whether the

phones were "genuine," *i.e.*, not counterfeit, was plainly a factual

determination for the jury in this case. *See Sullivan v. Louisiana*,

508 U.S. 275, 277–278 (1993) (The Fifth and Sixth Amendments require

a jury finding that a defendant is guilty of every element of a crime

beyond a reasonable doubt); § 2320; 5-ER-1158–91; 2-ER-398–401, 405–

08, 413–18. The district court erred by excluding Ellington's origin

testimony.

51

2.    **Ellington's testimony was necessary for the Appellants to present a complete defense and receive a fair trial, and the Government will be unable to prove the error was harmless beyond a reasonable doubt.**

When "an evidentiary error has occurred in a criminal prosecution, [this Court then reviews] de novo whether the error 'rises to the level of a constitutional violation.'" *United States v. Haischer*, 780 F.3d 1277, 1281 (9th Cir. 2015) (quoting *United States v. Pineda-Doval*, 614 F.3d 1019, 1032 (9th Cir. 2010)). An error amounts to a constitutional violation if, for example, "the district court incorrectly excluded evidence that was necessary for the defendant to refute a critical element of the prosecution's case, and evidence that was essential to the defendant's alternative theory of the case." *Pineda-Doval*, 614 F.3d at 1033 (citations omitted). If it does, the Court must reverse the conviction unless the Government proves beyond a reasonable doubt that the error did not "contribute to the verdict obtained." *Chapman*, 386 U.S. at 23–24; *see also Haischer*, 780 F.3d at 1281.

The district court's erroneous exclusion of Ellington's origin testimony amounts to a constitutional violation of his right to a fair

trial and to present a defense. *See* U.S. CONST. amends. V, VI; *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Haischer*, 780 F.3d at 1281. Whether the phones sold by the Appellants were counterfeit is central to the majority of the charges in this case. *See, e.g.*, 5-ER-1158–91; 2-ER-398–401, 405–08, 413–18. By precluding the Appellants from presenting Ellington's origin testimony, the district court categorically denied them ability to present the only evidence they could offer to rebut the critical allegation that the phones were "counterfeit," and support their defense that the phones were in fact genuine but refurbished. *See, e.g.*, *Pineda-Doval*, 614 F.3d at 1032 ("the improper exclusion of evidence of CBP policies essentially deprived Pineda-Doval of all evidence in his favor, and thus violated his constitutional right to present a complete defense.") (quotation marks and citation omitted); *see also* 3-ER-811 (the Government explaining that "the Appellants have always maintained that their products are genuine, 'secondary-market' phones. To support this claim, the Appellants rely *solely on expert testimony from Mr. Ellington and Mr. Levitan.*"[10]) (emphasis added). This error amounts to a constitutional violation, and the

---

[10] Levitan did not testify at trial two.

Government will be unable to prove it was harmless beyond a

reasonable doubt.[11] *See Chapman*, 386 U.S. at 23–24. The Court should

vacate the judgments and remand for a new trial.

## IV. The district court abused its discretion by allowing the Government and its witnesses to repeatedly misuse the term "counterfeit" at trial.

### A. Introduction

As discussed above, a good and mark are only counterfeit under

§ 2320(a)(1) and (f)(1)(A) if the mark incorrectly identifies the origin of

the good to which it is attached. *See supra*, Issues I and III. And

whether the devices in this case were "counterfeit" under § 2320 was

one of the main issues for the jury to decide. Yet the district court

allowed the Government and its witnesses to misuse the term

"counterfeit" as a synonym for "inauthentic" hundreds of times during

the second trial.[12] This misuse of the term was not helpful, invaded the

---

[11] Even if this error does not rise to the level of a constitutional violation, the Government will be unable to show it is more probable than not that the error did not materially affect the jury's verdict. *See United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997).
[12] The Defendants asked that the parties only use the term "counterfeit" to describe the charges or to argue about the legal conclusions it wished for the jury to draw, and that the parties use terms such as "fake," "knockoff," "non-genuine," or "inauthentic" to describe the evidence and the witnesses' conclusions.

province of the jury, and was unfairly prejudicial and confusing.
Because the misuse of "counterfeit" was so pervasive, and the jury's
counterfeit determination so fundamental to the case, it rendered the
Appellants' trial fundamentally unfair and requires remand.

### B.    Background

#### 1.    The Appellants' Motions

The Appellants moved to limit the misuse of the term "counterfeit"
before both trials. 4-ER-1087–1102; 3-ER-825–41. They argued the
Government's use of the term was inconsistent with § 2320, and that its
misuse was not helpful, invaded the province of the jury, was unfairly
prejudicial and confusing, and would deprive the Appellants of their
Fifth Amendment right to a fair trial. 4-ER-1088–91, 1093–94; 3-ER-
825–41.

The district court disagreed. 2-ER-480–88; 4-ER-922–50. It
acknowledged that the Government and its witnesses were not
necessarily using the term "counterfeit" consistently with § 2320, but
reiterated its conclusion that it would be "impractical foolishness" to
preclude the parties and witnesses from misusing the term. 2-ER-481–
82. It acknowledged that the parties should use the word "sparingly,"
and that they could use "synonyms such as non-genuine, inauthentic,

55

fake, not real, [and] knock-off." 2-ER-487–88. It believed an occasional

cautionary instruction would be sufficient to cure any prejudice.  2-ER-

487–88.

### 2.    The Second Trial

The Government and its witnesses misused the term "counterfeit"

over and over during the second trial.[13] For example, Hogg agreed that

if a trademark is printed or displayed improperly on an item, that is

typically "definitive" for his counterfeit analysis. 15-ER-3977. And when

Caras was asked to tell the jury what it would mean to her if she found

"*a trademark* that was incorrect," she responded: "I would say that it

was a counterfeit *product*." 16-ER-4248 (emphasis added). And the

Government showed the jury demonstratives of purportedly genuine

versus "counterfeit" Apple and Samsung marks—again, unattached to

---

[13] *See* 7-ER-1549–51, 1675, 1730; 8-ER-1894, 1945; 9-ER-2154, 2156,
2184, 2260, 2384; 10-ER-2491–92, 2519–20, 2551–53, 2559, 2579; 11-
ER-2914, 3031; 14-ER-3728, 3731–36, 3741–42, 3867, 3870–71, 3875;
15-ER-3961, 3963, 3976, 3980, 3981, 3983–85, 3989, 3992–93, 3995,
3997–98, 4002–05, 4020, 4023, 4026, 4030, 4035, 4039, 4044, 4050,
4053–54, 4058, 4063–71, 4073–76, 4103, 4203–07, 4237; 16-ER-4246,
4248, 4251–52, 4259, 4261–63, 4270, 4275–77, 4280–81, 4289, 4365,
4371–75, 4379, 4438, 4516–17; 22-ER-6149.

any goods. 15-ER-3962 (discussing Tr. 2 Ex. D-2824; *see* 26-ER-7419–39); 16-ER-4249 (discussing Tr. 2 Ex. D-2823; *see* 26-ER-7372–7418).

What's more, the Government attorneys frequently opted to ignore the court's *suggestion* that they use synonyms for the lay version of "counterfeit." For example, after defense counsel objected to a question regarding "counterfeit" packaging, the court advised Government counsel to "be careful" in phrasing their questions. 15-ER-3992–93. The Government then confusingly attempted to define the witness's use of the term, and again asked about "counterfeit" packaging. 15-ER-3992–93. And as discussed above, the Government reminded the jury in closing: "You heard from Leah Caras that over 99 percent of the items that she reviewed were *counterfeit*." 24-ER-6879 (emphasis added). "Jim Hogg testified that a small number were genuine, but well over 90 percent were *counterfeit*." 24-ER-6880 (emphasis added).

The district court did not define "counterfeit" under § 2320 until the final jury instructions, *see* 2-ER-372–444, instead telling the jury to essentially "hold off" on deciding whether the witnesses were using the term correctly. And it offered only a few vague and incorrect cautionary instructions during the Government's case in chief. For example, it told

57

the jury: "[W]hen a witness or counsel uses a term like 'counterfeit,' . . . they are using their own understanding of that term, and it *may or may not* correspond with the definition the Court gives you at the end of the trial." 15-ER-3992–93 (emphasis added); *see also* 14-ER-3731–32; 16-ER-4251.

## C.    Standard of Review

Claims of improperly admitted evidence are generally reviewed for an abuse of discretion. *United States v. Mitchell*, 502 F.3d 931, 967 (9th Cir. 2007).

## D.    Argument

### 1.    The district court abused its discretion by allowing the Government's witnesses to misuse the term "counterfeit" while opining on the evidence.

Lay opinion testimony is only admissible if it is "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701(b). "Testimony that simply tells the jury how to decide is not considered helpful as lay opinion." *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1059–60 (9th Cir. 2008) (citation and quotation marks omitted); *see also* Advisory Committee Notes, 1972 Proposed Rules, Fed. R. Evid. 701. ("If . . . attempts are made to

58

introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the rule.")

Expert opinion testimony is only admissible if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also* Fed. R. Evid. 401, 402. "[E]xpert testimony should not "invade the province of the jury." *United States v. Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993) (cleaned up, citation omitted). "[W]hen an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (citations omitted). Therefore, "an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Id.* at 1197 (citation omitted). As this Court explained in *Diaz*,

> Although the value of expert testimony lies in the specialized knowledge that an expert brings to bear on an issue in dispute, it is sometimes impossible for an expert to render his or her opinion on a subject without resorting to language that recurs in the applicable legal standard. We hold that if the terms used by an expert witness do not have a

59

specialized meaning in law and do not represent an attempt
to instruct the jury on the law, or how to apply the law to the
facts of the case, the testimony is not an impermissible legal
conclusion.

*Id.* at 1198–99 (cleaned up).

Here, the district court should have precluded the misuse of
"counterfeit" because, following the reasoning of *Diaz*, it was not helpful
as lay or expert opinion testimony and invaded the province of the jury.

First, as the district court recognized, the term "counterfeit" under
§ 2320 has "a specialized meaning in law." *Diaz*, 876 F.3d at 1199; *see* 2-
ER-485–86. But the witnesses were allowed to use their own undefined
understanding of "counterfeit" over and over again to describe the
marks or devices at issue. And because they used that term as a
synonym for an inauthentic mark or a good bearing an inauthentic
mark, it was directly at odds with § 2320.

Second, the witnesses' misuse of "counterfeit" went to one of the
main questions the jury had to decide, and merely told the jury "how to
apply the law to the facts of the case." *Diaz*, 876 F.3d at 1199. This is
especially true regarding the "trademark experts," who repeatedly
declared that the marks and devices were "counterfeit." *See, e.g.*, 15-ER-
3977; 16-ER-4248.

60

Third, particularly considering the district court's own recognition that witnesses could and should use synonyms for the vernacular meaning of "counterfeit," use of that specific term was simply not necessary to making witness' testimony helpful. *See* 2-ER-487–88; *Diaz*, 876 F.3d at 1198 (noting that "it is sometimes *impossible* for an expert" to opine on a subject "without resorting to language that recurs in the applicable legal standard") (emphasis added).

This "counterfeit" testimony was not helpful to the jury because it was not necessary, merely told the jury what result to reach, and urged a conclusion that was inconsistent with the meaning of "counterfeit" in § 2320.

> **2.    The district court should have precluded the misuse of the term "counterfeit" because it had no probative value, was confusing, and was unfairly prejudicial.**

A court may exclude even relevant evidence if the danger of "unfair prejudice, confusing the issues, [or] misleading the jury," substantially outweighs its probative value. Fed. R. Evid. 403. This can include the use of certain terms. *See, e.g.*, *United States v. Ray*, 803 F.3d 244, 260 (6th Cir. 2015) (recognizing the "potential unfair prejudice that may arise" by referring to the defendant as a "felon" in a prosecution of

61

prohibited possessor case, and also that other terms could be used instead); *United States v. Barela*, No. 1:20-CR-01228-KWR, 2021 WL 5177739, at *2 (D.N.M. Nov. 8, 2021) ("These terms have little probative value, and Defendant persuasively argues that to refer to any witness as 'the victim' or Defendant as 'the suspect' during the trial carries a significant risk of bias and is likely to improperly influence the jury.").

The district court should have precluded the misuse of "counterfeit" because it had no probative value and was unfairly prejudicial and confusing. *See* Fed. R. Evid. 403. Whether the goods were "counterfeit" was a central issue in the case and a question reserved for the jury. The witnesses' repeated misuse of the term "counterfeit" held virtually no probative value, particularly when the trial court itself recognized that witnesses "should be comfortable using synonyms, such as non-genuine, inauthentic, fake, not real, knock-off." 2-ER-487. At the same time, hearing "trademark experts" from some of the world's most iconic companies repeatedly declare that the trademarks and devices were "counterfeit" surely overawed and confused the jury, and in turn unfairly prejudiced the Appellants.

Further, the counterfeit determination was so critical in this case, and the Government and its witnesses' misuse of that term was so pervasive and misleading, that it rendered the Appellants' trial fundamentally unfair and denied them due process. *See* U.S. CONST. amend. V. The Government will be unable to prove beyond a reasonable doubt that the error did not "contribute to the verdict obtained."[14] *Chapman*, 386 U.S. at 24. This Court must vacate the judgments and remand for a new trial.

## V.   The district court constructively amended the superseding indictment by instructing the jury that it could convict the Appellants for conspiracy to traffic in counterfeit labels and packaging separately from any goods.

### A.   Introduction

Count 20 of the superseding indictment charged the Appellants with conspiring to traffic only in counterfeit goods, which includes counterfeit labels and packaging used on "or in connection with" those goods. But it did not charge the Appellants with trafficking in counterfeit labels and packaging independent from any goods. The district court thus constructively amended the indictment and deprived

---

[14] Even under the "more probable than not" standard applicable to non-constitutional error, this error requires remand. *See United States v. Charley*, 1 F.4th 637, 651 (9th Cir. 2021).

the Appellants of their Fifth Amendment right to stand trial only on the charges found by the grand jury. This Court must vacate the Appellants' convictions for conspiracy to traffic in counterfeit labels and packaging.

### B.    Background

The superseding indictment alleged that the Appellants,

> [D]id intentionally conspire and agree with one another . . . to traffic in *counterfeit goods*, to wit: by importing and offering for sale counterfeit [Apple and Samsung cell phones], [Apple and Samsung cell phones and accessories], labels, and packaging for the same, and thereby knowingly using counterfeit marks . . . *on or in connection with such goods* . . . .

5-ER-1167–68 (emphasis added). The Government later requested an instruction regarding conspiracy to traffic in counterfeit goods, *labels, or packaging*. 3-ER-745–48, 789–90, 802, 805 (trial two); *see also* 4-ER-898–901, 1067, 1069, 1070 (trial one).

The Appellants objected, arguing that the indictment charged only conspiracy to traffic in counterfeit goods (which included the labels and packaging used in connection with those goods), and did not charge them with trafficking in counterfeit labels and packaging separately from any goods. 3-ER-728, 738–39, 759–61; 2-ER-468 (trial two); *see also* 4-ER-887–90, 1039–40 (trial one). Therefore, the Government's

64

instruction would constructively amend the superseding indictment, deprive the Appellants of their Fifth Amendment right to stand trial only on the charges found by the grand jury, and amount to reversible error. *See* 3-ER-739.

The district court rejected the Appellants' argument, 24-ER-6787–90, and instructed the jury on conspiracy to traffic in counterfeit goods, counterfeit labels, and counterfeit packaging, 2-ER-398–399, 417–18; *see, e.g.*, 2-ER-422–23 (verdict form); *see also* 3-ER-647–48.

### C.    Legal Standards

#### 1.    Standard of Review

This Court reviews de novo whether the district court constructively amended the indictment. *United States v. Davis*, 854 F.3d 601, 605–06 (9th Cir. 2017).

#### 2.    Constructive Amendment

The Fifth Amendment guarantees a criminal defendant the right to stand trial only on charges returned by a grand jury in its indictment. *Stirone v. United States*, 361 U.S. 212, 215–16 (1960); U.S. CONST. amend. V. Thus, "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone*, 361 U.S. at 215–16; *Davis*, 854 F.3d at 605–06.

65

This Court has found constructive amendment of an indictment when (1) "there is a complex of facts presented at trial distinctly different from those set forth in the charging instrument," or (2) "the crime charged in the indictment was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *Davis*, 854 F.3d at 603 (cleaned up). A common example is when the jury instructions differ substantially from the conduct that was charged in the indictment. *See, e.g.*, *Davis*, 854 F.3d at 605–06 (constructive amendment when jury instructions allowed the jury to convict of trafficking a minor if Davis "had a reasonable opportunity to observe" the minor, but the indictment charged that Davis affirmatively knew or recklessly disregarded her age). Further, "a constructive amendment always requires reversal."[15] *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002) (citation omitted); *see also Stirone*, 361 U.S. at 215.

---

[15] By contrast, a variance "occurs when . . . the evidence offered at trial proves facts materially different from those alleged in the indictment," and requires reversal only if it prejudiced a defendant's substantial rights. *United States v. Adamson*, 291 F.3d 606, 614–15 (9th Cir. 2002) (citation omitted). Under either standard, the error here requires reversal.

66

### D.    Argument

Section 2320(a) makes it a crime to,

> (1) traffic[] in goods or services and knowingly use[] a counterfeit mark on *or in connection with such goods* or services, [or]

> (2) traffic[] in labels . . . or packaging of any type or nature, knowing that a counterfeit mark has been applied thereto, the use of which is likely to cause confusion, to cause mistake, or to deceive . . . .

(Emphasis added). Two takeaways from § 2320 show that the indictment did not charge the Appellants with trafficking in counterfeit labels and packaging separately from goods.

First, labels and packaging are not themselves goods. *Compare* § 2320(a)(1) (trafficking in counterfeit goods), *with* § 2320(a)(2) (trafficking in counterfeit labels and packaging); *see United States v. Giles*, 213 F.3d 1247, 1251, 1253 (10th Cir. 2000) (vacating Giles' conviction under an earlier version of the statute because, "[t]he 'goods' at issue in this case are the purses and handbags to which the [counterfeit] patch sets could be applied. The patch sets are not goods, but labels," and "[s]ection 2320 does not clearly penalize trafficking in counterfeit labels which are unattached to any goods."); Pub. L. 109-181, §§ 1(b), 2(b), Stat. 285, 288 (2006) (amending § 2320 by adding

67

subsection (a)(2) to close the loophole identified in *Giles*). Second, labels and packaging can be properly charged under § 2320(a)(1) only if they were used in connection with goods; if the labels and packaging were trafficked separately from a good, they must be charged under § 2320(a)(2).

Keeping these points in mind, the Appellants were unequivocally indicted for conspiring to traffic only in counterfeit goods, which includes counterfeit labels and packaging used on or in connection with those goods. *See* 5-ER-1167–68; § 2320(a)(1). But it did not charge the Appellants with trafficking in counterfeit labels and packaging independent from any goods. *See* 5-ER-1167–68; § 2320(a)(2).

Again, the superseding indictment alleges that the Appellants,

[D]id intentionally conspire and agree with one another . . . to *traffic in counterfeit goods*, to wit:

by importing and offering for sale counterfeit Apple iPhone, Apple iPhone chargers, Apple iPhone earbuds, Samsung S4 phones, Samsung S5 phones, Samsung S3 batteries, Samsung Note 4 batteries, Samsung S4 batteries, Samsung S5 batteries, Samsung chargers, *labels, and packaging for the same*,

and thereby knowingly using counterfeit marks . . . *on or in connection with such goods* . . . .

5-ER-1167–68 (emphases added, separated into three paragraphs for illustrative purposes).

Labels and packaging are not mentioned in the first or third parts of the charge; the superseding indictment only lists *goods*. Labels and packaging are only mentioned in the "to wit" clause of the charge. "To wit" means "that is to say; namely," and therefore it does not add to the crime charged, but rather describes it. *United States v. Garcia-Paz*, 282 F.3d 1212, 1215–16 (9th Cir. 2002) (citation omitted) (holding "from a purely textual and definitional analysis . . . [t]he inclusion of the 'to wit' phrase in the indictment was mere surplusage," and thus rejecting the defendant's argument that not including the reference to marijuana in the "to wit" clause of the indictment in the jury instruction altered the charge). In other words, the indictment charges the Appellants with trafficking in counterfeit labels and packaging used *in connection with goods*, but not with trafficking in labels and packaging independent of any goods.

Similarly, the caption of the superseding indictment, which includes a citation to § 2320(a)(2) dealing with labels and packaging, does not add to the charge itself. *See* 5-ER-1158; *United States v.*

69

*Pazsint*, 703 F.2d 420, 423 (9th Cir. 1983) (holding that "the caption is completely surplusage and does not control the body of the indictment," nor is "the statutory citation . . . regarded as part of the indictment.").

The grand jury indicted the Appellants for "conspiracy to traffic in counterfeit goods." 5-ER-1167–68; § 2320(a)(1). It did not charge the Appellants with conspiracy to traffic in labels and packaging unconnected with any goods. *See* 5-ER-1167–68; § 2320(a)(2). By instructing the jury on conspiracy to traffic in counterfeit labels and packaging, the district court constructively amended the superseding indictment and deprived the Appellants of their Fifth Amendment right to stand trial only on the charges found by the grand jury. *See Adamson*, 291 F.3d at 614–15. The Court must vacate the Appellants' convictions for conspiracy to traffic in labels and packaging in Count 20.

## VI. This Court must vacate the convictions because the errors in this case cumulatively deprived the Appellants of their right to a fair trial.

"[T]he cumulative effect of multiple trial errors can violate due process even where no single error would independently warrant reversal." *United States v. Preston*, 873 F.3d 829, 835 (9th Cir. 2017)

70

(quoting *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (cleaned up); *see also Chambers*, 410 U.S. at 291 n.3, 302–02; U.S. CONST. amend V. This Court will therefore "analyz[e] the overall effect of the errors in the context of the evidence introduced at trial against the defendant." *Preston*, 873 F.3d at 835 (quotation marks and citation omitted). That analysis asks "whether the errors stand in unique symmetry such that they amplify each other in relation to a key contested issue in the case." *Preston*, 873 F.3d at 835 (cleaned up).

That is precisely the case here. These errors thwarted the Appellants' ability to put their theory of defense—that the phones they sold were not counterfeit, but genuine and refurbished—to the jury, and therefore amplify each other in relation to that key contested issue. *See Preston*, 873 F.3d at 845. The district court did not allow Ellington to testify to the origin of the phones, which is one half of the counterfeit determination. It allowed the Government to use the term "counterfeit" inconsistently with § 2320, while permitting the "trademark experts" to bombard the jury with their conclusion that the marks and goods were "counterfeit." Further, it failed to adequately instruct the jury on what

71

amounts to a counterfeit good, and that repackaging genuine goods using inauthentic marks is allowed.

These mistakes infected the trial from start to finish and go to every charge in the case. *See, e.g.*, 5-ER-1158–91; 2-ER-398–401, 405–08, 413–18. Far from a usual criminal trial, the jury here was tasked with the already-difficult job of applying the cumbersome, multi-part definition of "counterfeit good" to 37 days of evidence and argument involving seven defendants and nineteen charges. Together, these errors deprived the Appellants of their right to present a complete defense, to a fair trial, and to due process. This Court should vacate the Appellants' convictions and remand for a new trial.

## VII. The district court miscalculated the forfeiture money judgments by using an erroneous interpretation of the law and evidence.

### A. Introduction

The district court's calculation of the amount of each money judgment in this case is based on an erroneous interpretation of the law defining forfeitable "proceeds," and mistakenly relied on over-inclusive

supplier evidence to establish the percentage of counterfeit goods sold. This Court should reduce the preliminary forfeiture orders.[16]

### B.    Background

Following the Appellants' convictions, the Government moved for preliminary orders of forfeiture, which the district court granted. 2-ER-363–71, 3-ER-578–620, 1-ER-43–93.[17] The district court ordered the Appellants to pay money judgments, as follows:

- Paul: $33,708,700.30

- Peter: $3,316,882.40

- Tim: $9,230,196.82

- Mikhail: $953,411.95

1-ER-281; 1-ER-148; 1-ER-141; 1-ER-274; 1-ER-88; 1-ER-256, 262; 2-ER-358; 1-ER-204; 1-ER-115, 123. These figures represent 93.1% of the Appellants' gross proceeds from Amazon sales, which the district court found were traceable to counterfeit goods. 1-ER-53–54.

---

[16] Because the district court ordered the value obtained from the liquidation of all listed property be applied to the money judgment, the Appellants do not separately challenge the forfeiture of the property itself in this joint brief.

[17] This issue does not pertain to David, who was not similarly situated to the other Defendants with respect to the forfeiture of his property.

## C.    Standard of Review

This Court reviews the interpretation of federal forfeiture law de novo, *United States v. Pollard*, 850 F.3rd 1038, 1041 (9th Cir. 2017), and reviews factual findings for clear error, *United States v. Lo*, 839 F.3d 777, 784 (9th Cir. 2016).

## D.    Argument

### 1.    18 U.S.C. § 981(a)(2)(B) applies to determine forfeitable proceeds because the Appellants sold lawful goods in an unlawful manner.

Federal law provides for the forfeiture of proceeds of wire or mail fraud and trafficking in counterfeit goods. For wire and mail fraud, the definition of proceeds depends on whether the crimes involve illegal goods or lawful goods. In cases "involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes," proceeds is defined to mean "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).[18]

---

[18] This civil forfeiture statute is made applicable to criminal forfeitures pursuant to 28 U.S.C. § 2461(c) and, in turn, 18 U.S.C. §§ 881 and 853(j).

74

In cases "involving lawful goods or lawful services that are sold or provided in an illegal manner," proceeds means "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services . . . except for overhead or taxes paid by the entity." § 981(a)(2)(B).

For trafficking in counterfeit goods, federal law permits forfeiture of "[a]ny property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of" the crime. 18 U.S.C. § 2323(a)(1)(A) and (C). The statute refers to criminal forfeiture procedures but does not further define "proceeds." § 2323(b)(2)(A). Below, the Appellants demonstrate that the definitions in § 981(a)(2) apply to convictions under § 2320.

The district court found that § 981(a)(2)(A) applied to the Appellants' convictions, reasoning that "knowingly selling counterfeit goods can never be done lawfully." 2-ER-365. That is true, but doesn't resolve the distinction between subsections (2)(A) and (2)(B) because the district court needed to take one more step to reach the correct result; that is, to parse the act of selling from the goods sold.

75

The counterfeit goods at issue consist of cell phones and related accessories that were sold on Amazon. But counterfeit goods are not per se illegal, nor were the Appellants' business activities inherently unlawful. Rather, trafficking in counterfeit goods criminalizes the sale of a counterfeit good if the seller knows it is counterfeit. Likewise, the sale of a counterfeit good is only fraudulent if it is misrepresented to be genuine. This is the essence of lawful goods being sold in an illegal manner. The district court recognized as much when it characterized "*selling counterfeit goods*" as the gravamen of the wire fraud offense. 2-ER-365 (emphasis in original).

Support is found in § 2320(a)(1), which criminalizes trafficking in goods the defendant *knows* are counterfeit, and the trafficking is done "*for purposes of commercial advantage or private financial gain.*" § 2320(f)(5) (emphasis added). It is not unlawful to knowingly possess a counterfeit item for personal use, or to unknowingly sell a counterfeit item.[19] Rather, only the sale of a counterfeit good, knowing it is counterfeit, is unlawful.

---

[19] The Justice Department agrees. *See* https://www.justice.gov/archives/

Contrast this statute with 18 U.S.C. § 2341(2), for example, which criminalizes the possession of contraband cigarettes without evidence of payment of taxes. Such cigarettes could never be sold lawfully because it is their mere possession that violates the Contraband Cigarettes Trafficking Act. *United States v. Hasan*, 718 F.3d 338, 346–47 (4th Cir. 2013). Consequently, contraband cigarettes are inherently unlawful, making gross proceeds forfeitable under § 981(a)(2)(A). *Hasan*, 718 F.3d at 346–47. Section § 2320, on the other hand, criminalizes only the *manner* in which counterfeit goods are sold, and not their mere possession. Counterfeit goods are not per se "illegal goods" under § 981(a)(2)(A).

Similarly, in *United States v. Carpenter*, 941 F.3d 1 (1st Cir. 2019), the Court explained that to fall under subsection (2)(B), "the crime must involve a good or service that could, *hypothetically*, be provided in a lawful manner." *Id.* at 7 (cleaned up) (emphasis added). Carpenter's convictions for mail and wire fraud arose out of how he

---

jm/criminal-resource-manual-1709-joint-statement-parts-c-and-d-definitions-trafficking-counterfeit (last visited July 7, 2024). Though archived, this section of the Manual is not obsolete because it was updated in January 2020, and § 2320 has not been amended since 2016.

solicited customers and misrepresented his property exchange business.
*Id.* The Court affirmed the district court's choice to use § 981(a)(2)(B)
because Carpenter provided what could have been a "legal service," but
which he operated in an illegal manner by misrepresenting to his
clients how their funds would be invested and then investing contrary
to those representations. *Id.* at 7–8. Here too, counterfeit phones can
*hypothetically* be sold without breaking the law. One who sells
counterfeit goods believing they are genuine has not trafficked in
counterfeit goods and has not committed a fraud. *See* §§ 1341, 1343,
3231(a)(1); *see also United States v. Mahaffy*, 693 F.3d 113 (2d Cir.
2012) (applying § (2)(B) to conspiracy to commit securities fraud
because the illegality occurred when the defendants sold securities as
part of a scheme involving bribery and frontrunning); *United States v.
Nacchio*, 573 F.3d 1062, 1090 (10th Cir. 2009) (applying § (2)(B) to
securities sold on the basis of material, nonpublic information).

The district court provided no analysis of these and similar cases,
finding no reason to delve beyond its (erroneous) premise that
"knowingly selling counterfeit goods can never be done lawfully." 2-ER-
365–68.

78

Here, the jury concluded that the Appellants trafficked in counterfeit goods and fraudulently sold counterfeit goods as genuine. In other words, these convictions involve lawful goods sold in an illegal manner—either knowing they were counterfeit for the trafficking counts, or knowingly misrepresenting that they were genuine for the fraud counts—and so § 981(a)(2)(B) applies. The district court was therefore obligated to deduct the direct costs incurred in providing goods and services, except for overhead and tax payments made by the various business entities. § 981(a)(2)(B).

This result applies equally to Appellants' convictions for conspiracy to traffic in counterfeit goods. § 2320, 2323(a)(1)(C). Section 981(a)(1)(C) allows the Government to civilly forfeit "proceeds" of "specified unlawful activities" as defined in § 1956(c)(7), and § 1956(c)(7)(D) lists trafficking in counterfeit goods as a specified unlawful activity. Therefore, the proceeds of trafficking in counterfeit goods are also subject to forfeiture under § 981, including its distinction between crimes involving inherently unlawful goods and those involving deceptive business practices.

79

The district court's application of gross proceeds to forfeitures under § 2323, based on *United States v. Prasad*, 18 F.4th 313 (9th Cir. 2021), was misplaced. 2-ER-369–70. First, the *Prasad* Court was dealing with criminal forfeiture of proceeds of visa fraud under § 982(a)(6)(A)(ii)(I) and had no occasion to consider how § 981 interacts with § 2320. Additionally, the visa fraud statute was designed as a stand-alone criminal forfeiture provision and did not incorporate by reference civil forfeiture statutes. And, finally, the concurring judge on the panel would have affirmed the forfeiture of gross receipts as facilitating property, which "sweeps more broadly" than forfeiture of "proceeds obtained directly or indirectly from the commission of the offense." *Prasad*, 18 F.4th at 317, 328 (Christen, J., concurring). The judge took issue with the breadth of the majority's holding and would have affirmed on narrower grounds. *Id.* at 327.

The district court also did not consider the legislative history of the applicable statutes, which supports Appellants' view. Congress included § 981(a)(1)'s current definition of "proceeds" within the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), eight years before it enacted the PRO-IP Act in 2008. Pub. L. 106-185, § 20, 114 Stat. 202

80

(2000). When Congress enacted § 2323(a)(1) as part of the PRO-IP Act, § 981(a)(1)'s definition of forfeitable proceeds for specified unlawful activities like trafficking in counterfeit goods was already on the books. Had Congress wanted to alter that definition, it could have simply put the word "gross" before "proceeds" in § 2323(a)(1)(C).

Finally, as a policy matter, it makes sense for Congress to decide that § 981(a)(2)'s provision fills in the definition of "proceeds" in this type of case. Trafficking in counterfeit goods is similar to the types of cases to which § 981(a)(2) applies, like wire and mail fraud. It is a species of fraudulent activity that is often conducted by otherwise legitimate businesses. When Congress enacted § 981(a)(2), it intended to provide partial relief to those who were selling otherwise lawful goods or services in an unlawful way to allow them to keep their direct costs. Conversely, it intended for those whose businesses are inherently unlawful, like drug trafficking, not to get that benefit.

For all the foregoing reasons, the Appellants' forfeitable proceeds are limited to "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in

81

providing the goods or services . . . except for overhead or taxes paid by the entity." § 981(a)(2)(B).

Direct costs were calculated by defense expert Christopher Linscott, a Certified Public Account who reviewed "bank records, underlying account documents, corporate records, revenue detail and other information" pertaining to the defendants' businesses. 3-ER-623; s*ee, e.g.*, 3-ER-632 (Paul Ex. D1.A-2 at 11); 3-ER-621. The Appellants in all hearings admitted Linscott's Declaration, which was uncontroverted by the Government. The district court found Linscott's declaration to be reliable. 1-ER-54. It also found his opinions and calculations credible, as evidenced by the court's adoption of Linscott's findings regarding double counting. 1-ER-56–57. Linscott calculated the cost of goods sold as 68% and shipping costs as 6% for a total margin profit of 26%. 3-ER-634–35 (Paul Ex. D1.A-2 at 13–14). The Government presented no evidence to refute these calculations. Accordingly, this Court should accept Linscott's analysis of direct costs and calculate the Defendants' money judgment by subtracting 74% from their gross Amazon proceeds.

82

**2.**     **The district court clearly erred by failing to exclude non-indicted brands in its calculation of criminally-derived proceeds.**

Federal Rule of Criminal Procedure 32.2(b)(1)(A) requires the Government to prove, by a preponderance of the evidence, a nexus between property sought to be forfeited and the crime involved. *United States v. Mancuso*, 718 F.3d 780, 799 (9th Cir. 2013). Similarly, § 981(a)(1)(C) only permits forfeiture of property that constitutes or is derived from proceeds traceable to a violation of the fraud. Based on those principles, and after finding "insufficient evidence from the trial that employees intentionally included or sold separately genuine products to facilitate counterfeit sales," the district court denied the Government's motion for forfeiture of 100% the Appellants' sales on Amazon. 1-ER-56. Instead, relying on "supplier evidence" admitted at trial, the district court determined that all but 6.9% of the products sold on Amazon were demonstrably counterfeit. 1-ER-53–54.

The district court was on the right track by excluding lawfully sold goods from its calculation of forfeitable proceeds. But a portion of the product mix that was sold over the years included brands other than Apple and Samsung, which were the only brands included within the

83

superseding indictment. 5-ER-1158–91. Therefore, proceeds from any non-Apple or non-Samsung product sold cannot be included toward the money judgments. Similarly, proceeds from any goods sold that were accurately represented as used or refurbished cannot be included toward the money judgments.

The district court failed to make these distinctions. 1-ER-51–53. The fact that 93.1% of goods sold from five suppliers' was counterfeit does not make all 93.1% forfeitable: Only proceeds on sales of Apple and Samsung products are forfeitable under Rule 32.2(b)(1)(A), and these suppliers provided phones and accessories made by manufacturers other than Apple and Samsung.

This is clear from the trial evidence on which the district court relied. For a few examples of many, United Inform supplied Motorola batteries. 1-ER-51 (citing Tr. 2 Ex. 1300; *see* 26-ER-7304–14). Windigital supplied Nokia products. 1-ER-51–52 (citing Tr. 2 Ex. 4242; *see* 26-ER-7362–65). Sennex supplied products manufactured by Casio, HTC, Kyocera, LG, and Motorola. 1-ER-52 (citing Tr. Ex. 2479; *see* 26-ER-7352–61). Topphone supplied LG and HTC products. 1-ER-52 (citing Tr. Ex. 2434; *see* 26-ER-7315–29). And Wiss Wireless supplied

84

Motorola, Casio, LG, Nokia, HTC, Sprint, and Blackberry products. 1-ER-52 (citing Tr. Ex. 2442; *see* 26-ER-7330–51). The district court's finding that 90% of Apple and Samsung items bore counterfeit marks is helpful only if the court also knew what percentage of the total sales were from Apple and Samsung products. 1-ER-52. But the court didn't take that approach. Instead, the court wrongly focused on "percent of the goods sold," "thousands of items seized," "thousands of items that the defendants sold," "each sale [having] a counterfeit trademark," and simply concluded that "counterfeiting fraud permeated their business . . . ." 1-ER-51–53. A more exacting approach was required under Rule 32.2(b)(1)(A).

Linscott conducted the analysis the district court was obligated to do—by combing through thousands of Amazon sales, namely 540,000 transactions and $43 million in sales spanning six years. 1-ER-50; 3-ER-624–25 (Paul Ex. D1.A-2 at 3–4). He concluded that, from 2012 to 2018, the portion of Amazon revenue attributable to non-indicted brands amounted to an average of 14.3% of the total goods sold. 1-ER-54; 3-ER-624–25, 32 (Paul Ex. D1.A-2 at 3–4, 11). This evidence was not refuted by the Government.

The district court clearly erred by including non-indicted brands in its calculation. A factual finding is clearly erroneous "when a review of the entire record leaves the definite and firm conviction that a mistake has been committed." *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1357 (11th Cir. 2020) (cleaned up); *accord United States v. Arroyo,* 75 F.4th 705, 710 (7th Cir. 2023); *United States v. One Star Class Sloop Sailboat built in 1930 with hull no. 721, named "Flash II",* 546 F.3d 26, 35 (1st Cir. 2008) ("we will override the court's valuation only if on the whole of the evidence we reach the irresistible conclusion that a mistake has been made.") (internal quotation and citation omitted). As to these products, the Government did not meet its burden of proving a nexus to the crimes. *Mancuso*, 718 F.3d at 799. This Court should further subtract 14.3% from the Defendants' gross Amazon proceeds to account for untainted goods. *See Honeycutt v. United States*, 581 U.S. 443, 454 (2017) (holding that only tainted property is criminally forfeitable).

For all the foregoing reasons, each Defendant's money judgment should be 11.7% of their gross Amazon sales (net proceeds reduction of

74% plus untainted goods reduction of 14.3% equals a total reduction of 88.3%), which would yield the following amounts:

- Paul: $4,236,216.91

- Peter: $416,836.99

- Tim: $1,159,971.03

- Mikhail: $94,103.33

This Court should order that their money judgments be reduced accordingly.

## CONCLUSION

The Appellants respectfully request that this Court vacate their judgments and remand to the district court for a new trial with correct jury instructions and Ellington's origin testimony, and without the misuse of the term "counterfeit" and the uncharged offense of conspiracy to traffic in counterfeit labels and packaging. The Court should also order that the district court recalculate the Appellants' money judgments.

Date: August 14, 2024

/s/ Maya P. Waldron
Maya P. Waldron
/s/ Amy Krauss
Amy Krauss
*Attorneys for Defendant-Appellant*
*Pavel Babichenko*

/s/ Greg S. Silvey
Greg S. Silvey
/s/ Rob Lewis
Rob Lewis
*Attorneys for Defendant-Appellant*
*Timofey Babichenko*

/s/ Paul Riggins
Paul Riggins
/s/ Mike French
Mike French
*Attorneys for Defendant-Appellant*
*Piotr Babichenko*

/s/ Craig H. Durham
Craig H. Durham
*Attorney for Defendant-Appellant*
*Mikhail Iyerusalimets*

/s/ Robyn Fyffe
Robyn Fyffe
*Attorney for Defendant-Appellant*
*David Bibikov*

88

## Statement of Related Cases

Counsel for Defendants-Appellants are not aware of any related cases currently pending in this Court. The Appellants' individual briefs in this appeal are due September 20, 2024.

Date: August 14, 2024

*/s/ Maya P. Waldron*
Maya P. Waldron
*Attorney for Appellant*
*Pavel Babichenko*

89

## Certificate of Compliance for Briefs

### 9th Cir. Case Numbers 23-549, 23-550, 23-558, 23-559, 23-561, 24-2188 & 24-2189

      I am the attorney. **This brief contains 16,501 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

      I certify that this brief:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

      [ ] it is a joint brief submitted by separately represented parties;

      [ ] a party or parties are filing a single brief in response to multiple briefs; or

      [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[X] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *_/s/Maya P. Waldron_*          **Date** August 14, 2024

90