**Nos. 23-549, 23-550, 23-558, 23-559, 23-561, 24-2188 & 24-2189**

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

TIMOFEY BABICHENKO, PAVEL BABICHENKO,
MIKHAIL IYERUSALIMETS, PIOTR BABICHENKO, AND DAVID BIBIKOV,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Idaho, Boise
No. 18-CR-258-BLW
Hon. B. Lynn Winmill

---

### APPELLANTS' JOINT REPLY BRIEF

---

Counsel listing on next page.

Maya P. Waldron
Waldron Legal, PLLC
P.O. Box 1316
Boise, ID 83701
(208) 244-0735
maya@waldronlegal.com

Amy B. Krauss
Attorney
P.O. Box 65126
Tucson, AZ 85718
(520) 400-6170
abkrauss@comcast.net

*Attorneys for Defendant-Appellant
Pavel Babichenko*

Greg S. Silvey
Silvey Law Office Ltd
P.O. Box 5501
Boise, ID 83705
(208) 286-7400
greg@idahoappeals.com

Rob Lewis
Attorney At Law
913 W. River St. Ste. 430
Boise, ID 83702
(208) 395-0667
office@roblewislaw.com

*Attorneys for Defendant-Appellant
Timofey Babichenko*

Paul Riggins
Riggins Law
P.O. Box 653
Marsing, ID 83639
(208) 344-4152
rigginslaw@gmail.com

Mike French
Mike French Law
223 N. 6th St., Ste. 330
Boise, ID 83702
(208) 699-4709
mike@mikefrenchlaw.com

*Attorneys for Defendant-Appellant
Piotr Babichenko*

Craig H. Durham
Ferguson Durham, PLLC
223 N. 6th Street, Ste. 325
Boise ID 83702
(208) 724-2617
chd@fergusondurham.com

*Attorney for Defendant-Appellant
Mikhail Iyerusalimets*

Robyn Fyffe
Fyffe Law
PO Box 5681
Boise, ID 83705
(208) 338-5231
robyn@fyffelaw.com

*Attorney for Defendant-Appellant
David Bibikov*

# Table of Contents

Table of Authorities.................................................................................. iv

INTRODUCTION....................................................................................... 1

FACTUAL MISSTATEMENTS AND RECURRING ARGUMENTS...... 1

ARGUMENT.............................................................................................. 8

I.    The district court erred by declining the Appellants' proposed instruction defining a "counterfeit mark" as one that is likely to cause confusion, mistake, or to deceive about the origin of the good. ...................................................................................................... 8

    A.    The Government misstates the Appellants' argument.......... 9

    B.    The instructions as a whole did not cure the error.............. 11

II.    The district court erred by refusing the Appellants' proposed jury instruction that it is not a crime to repackage genuine goods not intended to confuse or deceive. ..................................... 14

    A.    The Government improperly assumes the phones were not genuine. .............................................................................. 14

    B.    The Government mischaracterizes the record. .................... 16

    C.    The Government relies on legal authorities that do not actually support its position............................................... 17

III.    The district court erred by excluding defense expert Derek Ellington's testimony regarding the origin of the phones............. 20

    A.    The Court should reject the Government's attempt to recast its failed challenge to Ellington's reliability as a "relevance" argument. ......................................................... 20

    B.    The Government mischaracterizes Ellington's qualifications and testimony............................................... 22

C.   The erroneous exclusion of Ellington's testimony was not harmless. ............................................................................ 25

    1.   Ellington did not testify to the origin of the phones... 25

    2.   The Appellants did not present "a robust origin-of-the-cellphone defense." .............................................. 29

IV.   The district court abused its discretion by allowing the Government and its witnesses to repeatedly misuse the term "counterfeit" at trial. ....................................................... 32

A.   The Court should reject the Government's attempt to undermine the Appellants' argument by reframing this issue. ........................................................................... 32

B.   The Government has implicitly conceded three of the Appellants' arguments. ......................................................... 33

C.   The Government's arguments regarding the "trademark experts" are legally and factually baseless. .......................... 34

D.   The Government's and its witnesses' misuse of "counterfeit" was not harmless. ........................................... 38

V.   The district court constructively amended the superseding indictment by instructing the jury that it could convict the Appellants for conspiracy to traffic in counterfeit labels and packaging separately from any goods. .......................................... 41

A.   Labels are not a subpart of goods. ...................................... 42

B.   The indictment's language tracks § 2320(a)(1), not (a)(2)... 43

VI.   This Court must vacate the convictions because the errors in this case cumulatively deprived the Appellants of their right to a fair trial. ............................................................................. 48

VII.  The district court miscalculated the forfeiture money judgments by erroneously interpreting the law and evidence. ....................... 49

A.   Counterfeit goods are not contraband. ................................ 50

ii

B. The Government's interpretation of § 2323 as providing an "independent path" for forfeiting gross proceeds overlooks the statute's reliance on substantive provisions of civil forfeiture law. ........................................................................... 54

    1. The definition of "proceeds" within § 2323 refers to civil forfeiture and does not apply to this criminal forfeiture. ..................................................................... 54

    2. Neither the legislative history of § 2323 nor the cases cited by the Government support its argument that § 2323 was meant to expand criminal forfeiture of counterfeiting proceeds beyond that provided for under civil forfeiture law. ............................................ 56

    3. Trafficking in counterfeit goods is similar to the types of cases to which § 981(a)(2) applies. ................. 59

    4. The Court should apply the rule of lenity to resolve any ambiguity in the Appellants' favor. ...................... 60

C. The district court's reliance on "supplier evidence" was erroneous because that metric included brands outside of the fraudulent scheme alleged in the superseding indictment. .......................................................................... 60

CONCLUSION ................................................................................. 65

Certificate of Compliance for Briefs ....................................................... 67

# Table of Authorities

## Cases

*Bradley v. Duncan*, 315 F.3d 1091 (9th Cir. 2002) ............................... 11

*Chapman v. California*, 386 U.S. 18 (1967) ......................... 13, 19, 25, 38

*Dreamwerks Prod. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998)
................................................................................... 5, 11, 18

*In re Winship*, 397 U.S. 358 (1970) ......................................................... 37

*May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211 (9th Cir. 1980) 42

*Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) ..................................... 57

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019) .............................. 34

*United States v. Brooks*, 772 F.3d 1161 (9th Cir. 2014) ................... 13, 19

*United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015) ................... 59

*United States v. Cline*, 148 F.4th 1162 (10th Cir. 2025) .................. 62, 64

*United States v. Cone*, 714 F.3d 197 (4th Cir. 2013) .............................. 19

*United States v. Farmer*, 370 F.3d 435 (4th Cir. 2004) ......................... 10

*United States v. Garcia-Paz*, 282 F.3d 1212 (9th Cir. 2002) ............ 47, 48

*United States v. Giles*, 213 F.3d 1247 (10th Cir. 2000) .................... 42, 43

*United States v. Hanafy*, 302 F.3d 485 (5th Cir. 2002) ........ 11, 15, 18, 19

*United States v. Harrell*, 530 F.3d 1051 (9th Cir. 2008) ........................ 50

*United States v. Hon*, 904 F.2d 803 (2d Cir. 1990) ....................... 5, 57, 58

*United States v. Int'l Bus. Machines Corp.*, 517 U.S. 843 (1996)........... 34

*United States v. Lo*, 839 F.3d. 777 (9th Cir. 2016) ............... 61, 62, 64, 65

*United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) ....................... 39

*United States v. Omidi*, 125 F.4th 1283 (9th Cir. 2025) ............ 58, 64, 65

*United States v. Pazsint*, 703 F.2d 420 (9th Cir. 1983) ......................... 46

iv

*United States v. Petrosian*, 126 F.3d 1232 (9th Cir. 1997) ............... 18, 51

*United States v. Prasad*, 18 F.4th 313 (9th Cir. 2021) ............... 58, 59, 60

*United States v. Ruvalcaba-Garcia*, 923 F.3d 1183 (9th Cir. 2019) ...... 21

*United States v. Santos*, 553 U.S. 507 (2008) ......................................... 60

*Wang v. Rodriguez*, 830 F.3d 958 (9th Cir. 2016) .................................. 50

*Watkins v. U.S. Bureau of Customs and Border Protection*, 643 F.3d 1189 (9th Cir. 2011) ................................................. 52, 53

*Weeks v. Angelone*, 528 U.S. 225 (2000) ................................................ 28

**Statutes**

15 U.S.C. § 1114 ....................................................................................... 35

15 U.S.C. § 1114(1)(a) ................................................................................ 4

15 U.S.C. § 1116(d)(1)(B)(i) ....................................................................... 4

15 U.S.C. § 1117(b) ..................................................................................... 4

15 U.S.C. § 1127 ......................................................................................... 4

18 U.S.C. § 853 ......................................................................................... 54

18 U.S.C. § 981 ........................................................................... 54, 55, 58

18 U.S.C. § 981(a) .................................................................................... 55

18 U.S.C. § 981(a)(1) ............................................................................... 57

18 U.S.C. § 981(a)(1)(C) .......................................................................... 58

18 U.S.C. § 981(a)(2) ........................................................... 55, 56, 59, 60

18 U.S.C. § 981(a)(2)(A) ..................................................................... 49, 64

18 U.S.C. § 981(a)(2)(B) .......................................................................... 49

18 U.S.C. § 982 ................................................................................... 58, 59

18 U.S.C. § 982(a) .................................................................................... 59

18 U.S.C. § 982(a)(1) ............................................................................... 58

18 U.S.C. § 982(a)(6)(A)(ii)(I) ................................................................. 58, 59

18 U.S.C. § 982(b) .......................................................................................... 58

18 U.S.C. § 1956(c)(7)(D) ............................................................................. 55

18 U.S.C. § 1963(a)(3) .................................................................................. 59

18 U.S.C. § 2320 ......................................................................................passim

18 U.S.C. § 2320(a) ................................................................................. 45, 46

18 U.S.C. § 2320(a)(1) .......................................................... 19, 42, 44-46, 50

18 U.S.C. § 2320(a)(2) ........................................................................ 22, 43-47

18 U.S.C. § 2320(c) ....................................................................................... 54

18 U.S.C. § 2320(f)(1) ............................................................................. 19, 22

18 U.S.C. § 2320(f)(1)(A)(iii) ..................................................................... 5, 43

18 U.S.C. § 2320(f)(1)(A)(iv) ........................................................................... 5

18 U.S.C. § 2320(f)(5) ................................................................................... 50

18 U.S.C. § 2320(g) ......................................................................... 14, 18, 19

18 U.S.C. § 2323 ............................................................................... 49, 54, 58

18 U.S.C. § 2323(a)(1) ............................................................................ 55, 57

18 U.S.C. § 2323(a)(1)(C) .................................................................... 54-57, 60

18 U.S.C. § 2323(a)(2) ................................................................................... 54

18 U.S.C. § 2323(b)(1) ................................................................................... 55

18 U.S.C. § 2323(b)(2)(A) ............................................................................. 54

19 U.S.C. § 1337(a)(1)(C) ............................................................................. 52

19 U.S.C. § 1526(d)(1) .................................................................................. 52

19 U.S.C. § 1595(a) ....................................................................................... 51

28 U.S.C. § 2461(c) ....................................................................................... 56

49 U.S.C. § 80302 ......................................................................................... 53

vi

49 U.S.C. § 80303 ...................................................................... 53

Lanham Act, 15 U.S.C. § 1051, et seq. ............................................. 3-6, 35

Pub. L. No. 106-185, 114 Stat. 202 (2000) .............................................. 57

Pub. L. No. 109-181, 120 Stat. 285 (2006) .............................................. 43

## Other Authorities

1 David B. Smith, Prosecution and Defense of Forfeiture Cases,
¶ 5.03[2] (2021) .............................................................................. 56

146 Cong. Rec. S1753-02, 2000 WL 309749 (March 27, 2000) .............. 60

3 McCarthy on Trademarks and Unfair Competition § 25:10 (5th ed.) .. 4

## Rules

Fed. R. Crim. P. 32.2(b) .......................................................................... 61

## Constitutional Provisions

U.S. Const. amend. V ............................................................................. 37

## INTRODUCTION

To bring the Court back to what is really at issue in this appeal: A good is only "counterfeit" if it bears a trademark that causes confusion, mistake, or deceives regarding the origin of the good. The district court's rulings precluded the Appellants from putting the law and evidence supporting that defense to the jury, while also allowing the Government to proceed on the legally baseless theory that any fake mark renders a good counterfeit. Nothing in the Government's response shows otherwise.

## FACTUAL MISSTATEMENTS AND RECURRING ARGUMENTS

The Government's brief contains factual misstatements of various degrees, as well as faulty arguments that appear in multiple issues. The Appellants will discuss these assertions in greater detail within each issue as necessary, but wish to put them into context at the outset.

As for the facts, the Appellants will not quibble over every instance where the answering brief has a different interpretation or spin on the evidence. For example, the Appellants refer to their suppliers as "refurbishers," while the Government gratuitously calls them "counterfeiters." However, some things do have to be corrected or

1

further explained because they amount to misrepresentations of the record.

Take the different explanations about the Appellants' multiple companies and why the commission-based sellers (what the Government calls the "6 percenters") created their own companies. According to defense expert David Howell, that is simply how things are done on Amazon so that a business can continue operating when their Amazon storefronts inevitably get shut down. 24-ER-6723. The Government's view, on the other hand, is that it was done to avoid detection. *See* Dkt. 55.1, Answering Brief ("AB") at 5–6.

Other differences arise when the Government simply ignores what has already been decided. For example, it claims that the Appellants "worked with these overseas counterfeiters to manufacture their products—even instructing them on how to make better, more-realistic counterfeit products to avoid detection. . . ." AB at 7. But the district court, when deciding restitution, found the exact opposite:

> [T]he government [argues] that Piotr, Pavel, and Timofey Babichenko "instructed manufacturers on how to create more passable counterfeits." But the trial evidence doesn't support that argument. Rather, the key takeaway from the trial evidence was that the defendants were purchasers of [allegedly] counterfeit goods—not manufacturers.

2

FER-25–26 (citation and footnote omitted).

The Government also highlights how it called two customers whose chargers malfunctioned, one causing charring but no injury. AB at 15. But those problems were outliers. *See, e.g.*, 6-ER-1312; 24-ER-6674–79. And the chargers are hardly the focus of this appeal; the vast majority of the issues go to the phones sold by the Appellants, not the accessories. The Court's analysis of the legal arguments in this case should not be swayed by the Government's emotional appeals.

Moving on to the Government's recurring legal arguments, it first conflates civil trademark infringement under the Lanham Act, 15 U.S.C. § 1051, et seq., with criminal trafficking in counterfeit goods, 18 U.S.C. § 2320, throughout its brief. It characterizes this case as being about "trademark infringement," or "criminal trademark infringement." *See, e.g.* AB at 26, 27, 29. To be clear, trademark infringement is regulated civilly in the Lanham Act, and "criminal trademark infringement" does not exist. Section 2320 criminalizes "trafficking in *counterfeit goods*"—decidedly not "trademark infringement."

3

This distinction is a meaningful one. Without getting too far into the weeds, the Lanham Act provides a cause of action for trademark infringement, which includes "use in commerce [of] any *reproduction, **counterfeit**, copy, or colorable imitation of* a registered mark in connection with the sale . . . of *any* goods" and which "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a) (emphases added). Counterfeiting is *just one type* of possible trademark infringement; the Lanham Act separately defines a counterfeit mark and provides treble damages for using counterfeit marks. *See* 15 U.S.C. § 1116(d)(1)(B)(i), § 1117(b), § 1127; 3 McCarthy on Trademarks and Unfair Competition § 25:10 (5th ed.). Importantly for our purposes, a mark is only "counterfeit" if it is "identical with, or substantially indistinguishable from," § 1127, "a mark that is registered on the principal register in the United States Patent and Trademark Office *for such goods* . . . sold . . . ." § 1116(d)(1)(B)(i) (emphases added). In other words, the use of a fake mark on any goods can amount to trademark infringement, but the mark will only be counterfeit if it is used on the same type of goods for which the mark is registered. *See* § 1114(1)(a), § 1116(d)(1)(B)(i).

Likewise, trafficking in counterfeit goods under § 2320 is narrower than the Lanham Act. *See United States v. Hon*, 904 F.2d 803, 806 (2d Cir. 1990). Section 2320 criminalizes only trafficking in counterfeit goods, it does not criminalize any other form of trademark infringement. And central to the counterfeit analysis is that the mark is used on or in connection with *the goods for which the mark is registered*, § 2320(f)(1)(A)(iii), and that it is likely to cause confusion about the origin of the goods, § 2320(f)(1)(A)(iv); *Dreamwerks Prod. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998).

Again, this difference is intuitive. A shoe manufacturer who makes a pair of tennis shoes from whole cloth and then affixes what appears to be a Nike "swoosh" mark to the shoes has made a counterfeit pair of Nikes under § 2320 and the Lanham Act. On the other hand, a refrigerator manufacturer that uses a Nike "swoosh" mark is not selling a "counterfeit" Nike fridge, because Nike doesn't make refrigerators and (presumably) has not registered the Nike swoosh for use with refrigerators. The refrigerator manufacturer may, however, be civilly liable for other types of trademark infringement if its use of the Nike swoosh is likely to cause confusion.

This conflation is advantageous for the Government because it draws attention away from the phones—which were undeniably refurbished Apple and Samsung devices, not devices made from whole cloth by "counterfeiters"—and focuses instead on the trademarks in isolation. From there, the Government relies on irrelevant trademark *infringement* principals, such as the trademark holder's "right to exclude others" from using their mark, to argue that the fake marks on the refurbished parts were "counterfeit." *See* AB at 26–27, 55–57.

This Court should not be misled. This is not a trademark "infringement" case, the bulk of the Lanham Act cases and policy on which the Government relies are irrelevant, *see, e.g.*, AB at 26–27, 34, 28–29, 55–57, and this Court's focus should be on "counterfeit goods" as set forth in § 2320.

Next, the Government's continued misuse of the term "counterfeit" on appeal underscores the Appellants' claim that the district court abused its discretion by not limiting the misuse of that term at trial. *See* Dkt. 22.1, Joint Opening Brief ("JOB") & *infra* at Issue IV. Take the Government's argument regarding Issue II, the repackaging defense, as an example. It claims that the Appellants have "conceded" that the

phones were "adulterated with component parts bearing *counterfeit* Apple and Samsung trademarks." AB at 35 (emphasis added). False.

The Appellants have been fighting for the last eight years to prove that any "fake" marks were not "counterfeit" under § 2320 because the marks correctly identified the original manufacturers of the phones as Apple and Samsung. What the Government *means to say* is that the Appellants have acknowledged the parts used to refurbish the phones had "fake" marks, i.e., marks not made or placed by the trademark holder. But the Government's claim that everyone agrees the marks are "counterfeit" is a fundamental and confusing misrepresentation of the record and the Appellants' position.

Finally, the Government at times faults the Appellants for selling used or refurbished phones as "new." *See* AB at 2–4, 7, 15–16, 35–37. But whether the phones were used or new has nothing to do with whether they were counterfeit. *See generally* § 2320. A genuine phone can be new or used, just as a counterfeit phone can be new or used. And at trial, the Government was not allowed to pursue the theory that the Appellants committed wire and mail fraud by selling *genuine but used goods* as new. 3-ER-716–17. Every charge in the superseding

7

indictment alleged that the goods sold by the Appellants were "counterfeit," and so the district court instructed the jury that it had to find the items were counterfeit under § 2320 to convict on every count in this case. 3-ER-710–25; 2-ER-372–444. Whether the phones were new or used is irrelevant; the question is whether they were counterfeit.

These factual misstatements and misplaced arguments undermine the Government's position throughout its brief.

## ARGUMENT

**I.      The district court erred by declining the Appellants' proposed instruction defining a "counterfeit mark" as one that is likely to cause confusion, mistake, or to deceive about the origin of the good.**

The Appellants have argued that to convict for trafficking in counterfeit goods, a jury must find beyond a reasonable doubt that a "spurious" trademark associated with goods or services was likely to confuse, mislead, or deceive about the origin—that is, the authenticity—of the goods themselves. *See* JOB at 27–37. Their theory of defense was straightforward. When a consumer purchases a phone originally manufactured by Apple, even if the phone later bears an inauthentic trademark after passing through the secondary market, the product's origin remains Apple. Such a good is not "counterfeit" under

8

§ 2320. Appellants requested a jury instruction consistent with that theory, but the district court declined to give it.

The Government, meanwhile, has urged a sweeping interpretation that focuses primarily, if not solely, on the authenticity of the trademark alone. During closing argument, for example, it relied heavily on the testimony of Apple and Samsung representatives to characterize the phones at issue as "counterfeit" simply because they bore one or more inauthentic marks. 24-ER-6879–80.

This Court should find that the Appellants are correct on the law, and that the district court erred when it refused their proposed instruction regarding the origin of the goods.

### A.    The Government misstates the Appellants' argument.

In the section in its answering brief titled "Legal Background on Criminal Trademark Infringement," the Government attacks an argument that Appellants do not make. It reframes Appellants' position as turning on the quality or functionality of the good bearing an inauthentic mark, rather than on the authenticity of the good itself. *See* AB at 26–29; *see also* AB at 45, 56 (making a similar red herring argument as to Issues III and IV).

The Appellants have not argued as much.[1] A defendant cannot escape guilt by showing that a counterfeit phone functioned as well as a genuine Apple or Samsung phone. Their argument is instead that if the phone was in fact manufactured by Apple or Samsung, then attaching an inauthentic mark to a replacement part does not make the entire phone counterfeit because the mark does not misrepresent the origin of the phone.

The snippets of cases the Government cites underscore this point. *See, e.g.*, AB at 28 (citing *United States v. Farmer*, 370 F.3d 435, 441 (4th Cir. 2004) ("the actual quality of the goods is irrelevant.")). Collectively, those cases suggest that the chief concern with counterfeit goods is that a fake but genuine-looking mark on a *fake good* can confuse or mislead consumers into thinking that the good was manufactured by the trademark holder. That is why quality and functionality are irrelevant: It is only the origin of the good that matters.

---

[1] As the Government is well aware. *See, e.g.*, 4-ER-981 (Appellants explaining, back in 2021, that "[c]ounterfeit goods—whether superior, equal, inferior, or dangerous—are equally criminalized under § 2320 because they are all counterfeit.").

10

The Government also recognizes that "the central inquiry [is] whether a 'reasonably prudent customer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks' because of the similarities between the genuine and counterfeit marks." AB at 27 (quoting *Dreamwerks*, 142 F.3d at 1129). That is precisely the Appellants' position. *See also United States v. Hanafy*, 302 F.3d 485, 487–89 (5th Cir. 2002) (§ 2320 criminalizes trafficking in counterfeit goods, not the resale or repackaging of genuine goods manufactured by the trademark holder). And that is why the failure to give the Appellants' requested jury instruction deprived them of a possible verdict under their defense theory and violated due process. *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002).

## B.    The instructions as a whole did not cure the error.

The Government next asserts that the district court's instructions adequately covered the defense theory. *See* AB at 30–33. They did not.

As the Appellants explained in their opening brief, it is true that the district court's definition of "spurious" partially incorporated the concept of origin, but it did so in a confusing and unclear way. *See* JOB at 35–36. The district court defined a "spurious" mark as one that "is

11

false or inauthentic, in that it deceptively suggests an erroneous origin of a good." 2-ER-414. The court treated "spurious" as a separate element of a "counterfeit mark." 2-ER-414. Critically, the instruction did not include the same limiting language as to the last element about leading to confusion, mistake, or deception. 2-ER-414. The result was a fragmented instruction that allowed the jury to treat the mere presence of an inauthentic mark as sufficient to establish a counterfeit good.

Still, the Government says that this piecemeal and confusing instruction is good enough. *See* AB at 30–33. That argument overlooks how the case was actually tried. The Government equated the presence of an inauthentic trademark with the existence of a counterfeit good. Its witnesses repeatedly used the word "counterfeit"—over defense objections—to describe fake marks and goods bearing fake marks, without the necessary comparison of the mark to the good. The concepts of "inauthentic trademark" and "counterfeit good" were repeatedly conflated.

The instruction deficiency was compounded by other rulings that narrowed the defense theory, such as the denial of a repackaging instruction and exclusion of Derek Ellington's origin testimony.

*See* JOB Issues II & III. The case itself was also unusually complex. It involved numerous defendants, dozens of counts spanning several years, highly technical testimony, and jury instructions and verdict forms spanning 73 pages.

Against that backdrop, the district court's fragmented instruction on "spurious mark" was insufficient to convey the defense theory. The Appellants' proposed instruction was necessary to clarify that § 2320 turns on whether the mark misrepresents the origin of the product itself, not merely whether a component bears an inauthentic trademark. Without that clarification, the jury was free to adopt the Government's incorrect legal premise and theory of the case: That any inauthentic mark renders a product counterfeit.

And, because the Government has not even attempted to argue the error was harmless, this Court must remand. *See Chapman v. California*, 386 U.S. 18, 24 (1967); *United States v. Brooks*, 772 F.3d 1161, 1171 (9th Cir. 2014).

13

**II.  The district court erred by refusing the Appellants' proposed jury instruction that it is not a crime to repackage genuine goods not intended to confuse or deceive.**

The Government argues that the district court properly refused the Appellants' requested instruction on the repackaging defense because the phones were not "genuine goods." AB at 33–41. That argument fails for at least three reasons.

**A.  The Government improperly assumes the phones were not genuine.**

The Government first assumes the answer to the very question the jury was supposed to decide as to all the charges in this case. Section 2320(g) expressly excludes from criminal liability the "repackaging of genuine goods or services not intended to deceive or confuse." The defense theory at trial was that the phones were genuine Apple or Samsung products that had been refurbished with replacement components. Whether those devices remained "genuine goods" that had been "repackaged" under § 2320(g) was a factual question for the jury, not a legal determination for the court.

14

The Government, on the other hand, contends that a defendant's "adulteration"[2] of a product in any way renders the repackaging defense unavailable. AB at 39. But whether a product was refurbished, and at what point that refurbishment rendered a phone "counterfeit," was a factual question for the jury. The Appellants should have been allowed to present expert testimony that whatever modifications were made to the devices—replacing screens, backplates, or batteries—did not change the essence of what Apple or Samsung originally created and were not intended to deceive regarding the origin of the goods. *See* JOB at Issue III. The Government could present testimony to the contrary. The district court should have then left the question about the genuineness of the phones to the jury.

---

[2] The Appellants take issue with the Government's repeated, gratuitous claim that they admitted the refurbished phones are "adulterated." *See* AB at 1, 21, 35, 36, 37 40. It appears the Government borrowed the term from *Hanafy*, 302 F.3d at 489 ("attaching a mark to trays containing the genuine unadulterated, unexpired products associated with that mark does not give rise to criminal liability under § 2320"). But *Hanafy* dealt with baby formula, which can't be refurbished. Electronics plainly can. A refurbished cellphone is thus not analogous to "adulterated" baby formula, and the Appellants have never acknowledged as much.

## B. The Government mischaracterizes the record.

The Government's argument also relies on various mischaracterizations of the record. It boldly asserts that the Appellants "*manufactured* and sold goods bearing counterfeit trademarks." AB at 35 (emphasis added); *see also* AB 40. There is no evidence, however, that the Appellants or the overseas refurbishers "manufactured" the goods from whole cloth. *See* AB at 35–36; *see also* AB at 2 (apparently conceding the phones were originally manufactured by Apple and Samsung: "Defendants had to refurbish *old* phones with counterfeit parts . . .") (emphasis added). The Government conflates replacing some exterior and component parts of a phone—"refurbishing" it, perhaps— with "manufacturing" the good itself. Those are not the same.

Likewise, the Government is flatly mistaken to claim that the Appellants' have "conceded" that the phones were "adulterated with component parts bearing *counterfeit* Apple and Samsung trademarks." AB at 35 (emphasis added); *see also supra* at 6–7; AB at 36–37 (misusing the term "counterfeit"). Instead, the Appellants' primary defense at trial, and argument now on appeal, is that the phones were

16

not counterfeit because their marks correctly identified Apple and Samsung as the manufacturers.

The Government incorrectly claims that Piotr Babichenko testified that the phones were refurbished "with parts manufactured by *counterfeiters*" and that Pavel Babichenko "agreed that the cellphones were refurbished with component parts bearing *counterfeit* trademarks." AB at 35 (emphases added). Piotr testified the phones were refurbished, and not by "counterfeiters" as the Government asserts. AB at 35 (citing 22-ER-6144). Pavel testified that the phones were refurbished but did not testify that the parts used to refurbish the phones bore "counterfeit" trademarks. AB at 36 (citing 23-ER-6601–02; 23-ER-6624–25; 23-ER-6631–33; 24-ER-6645). The Government's contention that "the undisputed facts" render a repackaging defense inapplicable to the phones is baseless. AB at 35.

## C.    The Government relies on legal authorities that do not actually support its position.

Neither § 2320, nor the caselaw interpreting it, support the Government's position. *See* AB at 39–40. Section 2320 does not criminalize trafficking in "counterfeit marks" as the Government suggests; it criminalizes "trafficking in counterfeit goods," and it defines

17

counterfeit goods as those bearing a mark that deceives or confuses as to the *origin of the good*. *See* JOB at 32–35; *see also* 2-ER-486–87 (the district court recognizing "a fake mark is not per se a counterfeit one").

The Government also overstates the Appellants' reliance on *Dreamwerks*. *See* AB at 39–40; JOB at 34. *Dreamwerks* simply illustrates the uncontroversial concept that a trademark causes confusion if it misrepresents the *origin of the good* to which it is attached. *See* 142 F.3d at 1129. The Government relies on *Dreamwerks* for the same principle. *See* AB at 27.

Finally, *United States v. Petrosian* doesn't advance the Government's argument because it did not involve a "refurbished" product. *See* AB at 39. Rather, Petrosian made imitation soda from whole cloth, and then put the soda into authentic Coca-Cola bottles. *See* 126 F.3d 1232, 1243 (9th Cir. 1997); *see also* JOB at 41–42 (discussing *Hanafy*, 302 F.3d 485). It therefore does not speak to the repackaging issue here.

The Government's position, if accepted, effectively collapses the statute. Under its reading, any good refurbished with parts bearing an inauthentic mark would automatically be "nongenuine" under § 2320(g),

even if they are not "counterfeit" under § 2320(a)(1) and (f)(1), thus eliminating the repackaging defense for refurbished but genuine goods. *See* JOB at 49–50. But § 2320(g) is intended to clarify that the repackaging and resale of genuine products—i.e., products that are not counterfeit—is not criminal merely because packaging bearing fake marks is used. *See United States v. Cone*, 714 F.3d 197, 212 (4th Cir. 2013).

At minimum, the evidence at trial provided a sufficient factual basis for the jury to consider whether the goods were "genuine." As the Fifth Circuit explained in *Hanafy*, § 2320 criminalizes trafficking in counterfeit goods, not the resale or repackaging of genuine goods manufactured by the trademark holder. 302 F.3d at 489–90. The jury, and not the court, should have decided whether the refurbished phones here remained genuine goods. Moreover, because the Government has here again failed to address harmlessness, the Court must remand. *See* AB at 33–41; *Chapman*, 386 U.S. at 24; *Brooks*, 772 F.3d at 1171.

19

**III. The district court erred by excluding defense expert Derek Ellington's testimony regarding the origin of the phones.**

The Appellants have shown that Ellington's origin testimony was relevant to the core question in this case—whether the goods, labels, and packaging were "counterfeit" under § 2320—and that the district court's erroneous exclusion of that testimony deprived the Appellants of their right to present a complete defense and receive a fair trial. The Government's arguments to the contrary, which depend on its misunderstanding of the applicable law or its mischaracterization of the record, fail to prove otherwise.

**A. The Court should reject the Government's attempt to recast its failed challenge to Ellington's reliability as a "relevance" argument.**

As the Appellants explained in their opening brief, "[b]efore allowing expert testimony, the district court must perform a gatekeeping role to ensure the testimony is reliable and relevant." JOB at 48. The district court unequivocally found that Mr. Ellington [is] qualified and that [his] opinions are reliable." 2-ER-537. Ellington's origin testimony was limited only because the court did not believe that testimony was relevant to "the trademark claims." 2-ER-537–38. Appellants have challenged that adverse ruling on appeal, arguing that

20

the district court's error lies in its initial misunderstanding that this was a "trademark" case. JOB at 48–51.

In response, the Government has muddled the two threshold questions for the admission of expert testimony—whether it is reliable versus whether it is relevant. *See United States v. Ruvalcaba-Garcia,* 923 F.3d 1183, 1188–89 (9th Cir. 2019). And it has failed to present any argument on the legal question that is actually before the Court: Whether the district court erroneously excluded Ellington's origin testimony as not relevant because it misunderstood § 2320 to be about fake trademarks rather than counterfeit goods. Instead, the Government has argued that Ellington's opinion was not *reliable* but has framed that argument as one of relevance. AB at 1 ("Whether the district court erred by partially excluding defense expert Derek Ellington's testimony that products were manufactured by Apple Inc. or Samsung *as irrelevant* when he had *no experience* with either manufacturer's products and he based his opinion on an *unsupported YouTube video*.") (emphases added); *see also* AB at 42–45 (arguing that Mr. Ellington did not have "relevant experience").

21

Have no doubt, Ellington's origin testimony was relevant to the core question of whether the goods, labels, and packaging were "counterfeit" under § 2320. *See* JOB at Issues I & III, § 2320(a)(2), (f)(1); 2-ER-414; 2-ER-417. Thus, the district court erred by excluding Ellington's origin testimony as not relevant to trafficking in counterfeit goods under § 2320.

## B. The Government mischaracterizes Ellington's qualifications and testimony.

Not only has the Government missed the mark on the legal question in this case; it has also relied on various misrepresentations of Ellington's qualifications and proposed testimony.

To begin, it claims that "[i]f the motherboard bore Apple or Samsung *trademarks*, then Mr. Ellington concluded it was manufactured by Apple or Samsung." AB at 42 (citing trial one,[3] 18-SER-4095–96) (emphasis added); *see also* AB at 46 ("Ellington's determination . . . depended *entirely on* each bearing a purported Apple or Samsung trademark.") (citing trial two, 21-ER-5769) (emphasis

---

[3] The Government's reliance on Ellington's testimony from the first and second trials, as opposed to his *Daubert* hearing testimony, is not proper because such testimony complied with the district court's erroneous ruling and was thus limited in scope by that ruling. *See* AB at 42–46.

22

added). False. Ellington conducted a wholistic analysis of the devices to determine that the components were consistent with known Apple and Samsung products. He documented the IMEI and serial numbers; visually inspected the internal chips, their configuration, connections, and purported manufacturers; and he looked for scuff marks, fingerprints, and different types of adhesive. 4-ER-1060; 4-ER-995; 4-ER-993; 4-ER-1023.

Next, the Government states "Mr. Ellington conceded that had [sic] no relevant experience in identifying genuine Samsung and Apple *products . . . .*" AB at 44 (emphasis added). Quite the opposite. His "extensive experience repairing Apple and Samsung smart phones and extracting their data . . . provided [him] with first-hand knowledge of the internal components of genuine iPhone and Samsung devices." 4-ER-1059; *see also* 4-ER-997.

The Government also repeatedly asserts that Ellington "relied upon *a* YouTube video for *the key fact* underlying his conclusion." AB at 43 (emphasis added); *see also* AB at 1, 45. That is a bold and confounding misstatement. As the Government is well aware, Ellington relied on twenty-five years of experience tearing down and repairing

23

phones, a meticulous examination of sample phones, and "known values of chips used in phones from multiple known sources of data" to determine what an authentic model of each phone should look like. 4-ER-1060; *see e.g.*, 4-ER-1015; 4-ER-1005.

Nor is it at all clear that Ellington himself relied on the particular video that the Government fervently claims was the sole basis for the key fact underlying his opinion. AB at 43; *see also* AB at 1, 45. Defense counsel cited that video a single time, *see* 20-SER-4623, while Ellington appears to have only discussed YouTube very broadly, *see, e.g.*, 4-ER-1015–16. To be sure, the Government pursued this same baseless attack below to try to undermine Ellington's reliability, 4-ER-1078, and it was rejected by the district court, 2-ER-537.

Finally, the Government confusingly claims that "according to Mr. Ellington, *no other component part* in the phone could be a non-Apple product, rendering the iPhone a genuine Apple product." AB at 42 (emphasis added). That is again incorrect. Ellington recognized that "[o]nly basic or cosmetic parts such as screens, frames and batteries can be replaced in Apple and Samsung devices while retaining the device's functionality." 4-ER-1133.

24

**C. The erroneous exclusion of Ellington's testimony was not harmless.**

The Government makes two arguments on harmlessness, both of which turn on a patent mischaracterization of the record. *See* AB at 46–51. The Government has not and cannot meet its burden of proving harmlessness beyond a reasonable doubt. *See Chapman*, 386 U.S. at 23–24.

**1. Ellington did not testify to the origin of the phones.**

The thrust of the Government's argument on prejudice is simply that Ellington in fact testified that the Appellants sold genuine Apple and Samsung phones. AB at 46–48; *see also* AB at 18. The record refutes that claim.

First, the district court reaffirmed its pretrial ruling that Ellington could only testify that the phones would have *operated as though they were* Apple and Samsung phones, but could not testify to the phones' origin or testify that only authentic Apple and Samsung phones would operate as such. *See, e.g.*, 20-ER-5735–21-ER-5745; 21-ER-5746–47; 21-ER-5786–87. The district court ruled on the Government's objections consistent with that order. *Compare, e.g.*, 21-ER-5777–78 (sustaining the objection "with regard to what this device

25

is represented to be"), *with* 21-ER-5813 (overruling the objection to testimony that the phones "would operate as Apple and Samsung products").

Second, Ellington in fact testified within the limits of the district court's ruling. Not once did he opine that a component or phone was "authentic" or "genuine." *See generally* 21-ER-5749–880. He started his testimony by clarifying that he was not a trademark expert, he does not work for a manufacturer, and he was there to "give an opinion as to the operability of the devices in question" based on a physical review of the hardware in the phones. 21-ER-5751. He confirmed as much throughout his testimony. 21-ER-5769; 21-ER-5864; 21-ER-5874. And his ultimate opinion was that he did not see any reason why each device would not *operate* as a Samsung or iPhone. *See* 21-ER-5779; 21-ER-5805; 21-ER-5811–12; 21-ER-5820; 21-ER-5836; 21-ER-5838; 21-ER-5853–54; 21-ER-5859–60.

Indeed, most of the testimony quoted by the Government as going to "origin" explicitly referenced operability and functionality. AB at 46–47 (quoting 21-ER-5813 ("operate"); 21-ER-5814 ("operate"); 21-ER-5817 ("operable"); 21-ER-5838 ("operable"); 21-ER-5852–53 ("function"); 21-

26

ER-5861 ("function")). The only times the terms "authentic" or "genuine" were used was by *the prosecutor*, to reiterate that Ellington *was not* opining about the genuineness of the components or trademarks. *See* 21-ER-5868; 21-ER-5874.

The handful of the Government's quotations that do not explicitly reference operability or functionality are deceptively plucked out of context. The Government quotes portions of Ellington's testimony where he analyzed the internal components of each device to determine the *purported model* involved, for example an iPhone 4 versus an iPhone 4S. AB at 47–48 (discussing Ellington's testimony regarding Exhibits 5008.A.2, 5008.A.3, 5009.A.4, 5009.A.5, and 5004.A); *see also* 21-ER-5821, 21-ER-5833-34. This was an issue because the superseding indictment charged the Appellants with trafficking specific models of phones, but as to Counts 21, 23, 28, and 30, the evidence showed that they had trafficked in *other* models. 3-ER-675–78. Regardless, the district court dismissed the counts related to those particular phones, and so their origin was not ultimately put to the jury. 3-ER-684–707.

Third, if the import of Ellington's testimony was ever unclear, the district court also gave multiple instructions limiting his testimony to

27

operability. 21-ER-5768; 21-ER-5776; 21-ER-5807. The Court presumes that the jury followed those instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Fourth, the Government's own representations below contradict its new-found claim that Ellington testified to the phones' origin. The prosecutor twice reminded the jury in closing that Ellington's "expertise was limited only to whether or not the phone worked," 24-ER-6856; *see also* 24-ER-6880, and that "functionality and operability have no bearing on whether or not something . . . was created by the trademark holder." 24-ER-6880.

Finally, had Ellington not been limited to operability, his testimony would have been very different. He would not have said he believed the phones would "operate as" Apple and Samsung phones. He would have testified, without mincing words, that: "[E]ach device he examined contained genuine Apple or Samsung components." 4-ER-1133. He would have further explained that is it is not possible "to mass produce . . . a nongenuine, nonApple phone that would happily run Apple software," 4-ER-1011–12, and "in this particular case, the devices

28

that [he] reviewed, [he] saw nothing to change that opinion," 4-ER-1016–17.

Thus, the Government has failed to explain how the exclusion of Ellington's origin testimony—which is in fact what happened at trial—did not contribute to the verdict. To compound the problem, the Government was allowed to misleadingly and incorrectly focus just on the purportedly "counterfeit" trademarks, without ever comparing the marks to the phones as required by § 2320.

### 2. The Appellants did not present "a robust origin-of-the-cellphone defense."

As to their constitutional right to present a complete defense, the Government asserts that the Appellants "called numerous experts and witnesses who testified to the secondary cellphone market, the procedures of refurbishing cellphones, and the resale of these cellphones on Amazon," and thus the Appellants "did present a robust origin-of-the-cellphone defense." AB at 48–49. Conspicuously absent from the Government's recitation of the Appellants' trial evidence is any evidence whatsoever as to the actual origin of the phones. *See* AB at 48–49. As thoroughly refuted above, Ellington did not in fact testify to the phones'

29

origin or authenticity. And the Government's other cited testimony does not address that issue.

As for the other defense experts, Rich Helfrich gave the jury an overview of the secondary phone market. *See* 21-ER-5883. Neil Shirk only testified about chargers. 22-ER-6183–246. Anthony Favazza discussed the refurbishing process generally, the secondary phone market, and Customs and Border Patrol seizures. 22-ER-6248–23-ER-6344. And David Howell, a "brand-protection" expert, testified about the practices of so-called "third party" sellers, marketplaces like Amazon.com, and the Appellants' storefronts on Amazon.com. 24-ER-6649; 24-ER-6656–773. Not one of those experts offered the testimony that only Ellington could give: That the phones sold by the Appellants were authentic but refurbished Apple and Samsung products. *See generally* 21-ER-5882–6029; 22-ER-6183–246; 22-ER-6248–23-ER-6344; 24-ER-6648–773; *see also* 3-ER-811.

Both Paul and Peter Babichenko *believed* they were selling genuine but refurbished Apple and Samsung phones, and they testified as much. 22-ER-6127; 23-ER-6347. But they did not and could not have provided the disinterested expert testimony that Ellington would have.

30

They testified as lay witnesses. They did not tear down and analyze the internal components of the phones to determine their origin. Nor did they have the expertise to do so.

That void of evidence stands in stark contrast to the testimony given by the brand representatives in this case. Leah Caras and Jim Hogg, self-proclaimed "trademark experts" testified over and over again that the phones themselves were "counterfeit." *See generally* 15-ER-3958–4076; 15-ER-4214–16-ER-4284; *see, e.g.* 15-ER-4075; 16-ER-4281. And the prosecutor reminded the jury in closing: "You heard from Leah Caras that over 99 percent of the items that she reviewed were counterfeit." 24-ER-6879. "Jim Hogg testified that a small number were genuine, but well over 90 percent were counterfeit." 24-ER-6880.

The Government's assertion that the Appellants "mounted a robust affirmative defense" that their cellphones were genuine is not supported by the record. AB at 50. The Appellants were precluded from presenting any such testimony precisely because the district court mistakenly believed the phones' origin was not relevant. The Government has not and cannot show that the erroneous exclusion of Ellington's origin testimony was harmless.

## IV. The district court abused its discretion by allowing the Government and its witnesses to repeatedly misuse the term "counterfeit" at trial.

The Appellants have challenged the district court's refusal to reign in the Government's and its witnesses' incessant misuse of the term "counterfeit" at trial. *See* JOB at 54–63. Because the misuse of "counterfeit" was so pervasive, and the jury's counterfeit determination so fundamental to the case, it rendered the Appellants' trial fundamentally unfair and requires remand. *See id.* at 63. The Government's answering brief does nothing to rebut those arguments.

### A. The Court should reject the Government's attempt to undermine the Appellants' argument by reframing this issue.

As an initial matter, the Government mischaracterizes the issue to undermine the Appellants' argument. It argues that "[t]he district court was well within its discretion in finding it simply too impractical to preclude any witness from using the word 'counterfeit' during a three-month trial," and goes on to discuss documentary exhibits that used the term. *See* AB at 51–53.

But Appellants are not arguing "any witness" should have been per se precluded from using the term "counterfeit." Instead, the district court abused its discretion by allowing "the Government and its

32

witnesses to *misuse* the term 'counterfeit' as a synonym for 'inauthentic' hundreds of times during the second trial." JOB at 54 (emphasis added). It is not the mere utterance of the term "counterfeit" that matters, but rather the affirmative representation of the Government and its witnesses, over and over again, that trademarks and phones at issue were "counterfeit" using a definition that is utterly at odds with § 2320.

The most problematic misuse of the term was by brand experts Leah Caras and Jim Hogg, as well as the Government attorneys themselves. *See* JOB at 56–57. The Government has not, nor can it, legitimize their relentless misuse of the term by pointing to exhibits that used the term "counterfeit." *See* AB at 52–53. No such exhibits required the brand representatives to testify that the marks and phones at issue in this case were "counterfeit." They *elected* to misuse the term despite the district court's admonition that they should use the term "sparingly" and "should be comfortable" using other terms. 2-ER-487; *see, e.g.*, 26-ER-7419–39 & 26-ER-7372–7418.

B.   **The Government has implicitly conceded three of the Appellants' arguments.**

The Government has failed to address a handful of the Appellants' arguments, and so has implicitly conceded them. *See, e.g., United States*

33

*v. Int'l Bus. Machines Corp.*, 517 U.S. 843, 855 (1996); *Sierra Club v. Trump*, 929 F.3d 670, 698 (9th Cir. 2019). The Government does not directly dispute the Appellants' contention that the brand representatives' use of the term "counterfeit" was inconsistent with the definition in § 2320. *See* JOB at 60; AB at 54–58. The Government has not argued that the brand representatives could not have used the terms suggested by the district court instead of the term "counterfeit." *See* JOB at 61; AB at 55–57. And the Government never addressed the Appellants' argument that the district court should have precluded the misuse of "counterfeit" because it had no probative value and was unfairly prejudicial and confusing. *See* JOB at 61–62; AB at 54–56. This Court should accept Appellants' arguments on these points.

C.    **The Government's arguments regarding the "trademark experts" are legally and factually baseless.**

As for the "trademark experts'" use of the term "counterfeit," the Government spends much of its argument discussing trademark holders' purported rights, mischaracterizes both the district court's holding and the brand representatives' testimony, and from there makes the bold argument that the trademark holders alone can

34

determine whether the marks and phones were "counterfeit." AB at 55–57. The Government is wrong across the board.

First, the Government's argument about the trademark holder's alleged rights is misplaced. *See* AB at 55–56; *supra* at 3–6. It asserts that "[t]rademark owners are victims of trademark-counterfeiting; they enjoy an exclusive right to prohibit others from trafficking in the spurious versions of goods and services bearing their marks . . . ." AB at 55. Not so. That suggestion conflates a trademark holder's civil rights under the Lanham Act with § 2320. *See* AB at 55. Although trademark holders have the right to pursue *civil* remedies for trademark infringement, it goes without saying that they cannot *prosecute* individuals for allegedly trafficking in counterfeit goods. *Compare* § 1114 *with* § 2320.

Second and relatedly, the Government mischaracterizes the district court's decision when claiming that, "[i]n accordance with this exclusive right, the district court properly found that the trademark holders were the authority on their products and allowed them to testify about counterfeit marks." AB at 56–57. The district court in fact held that "[t]he government's trademark experts can testify about whether

35

the marks were *made by the trademark holder.*" 2-ER-486 (emphasis added). It went on to elaborate that the trademark holders in the first trial testified that "the marks are fake," but it recognized that "a fake mark is not per se a counterfeit one." 2-ER-486. "[T]he counterfeit determination requires complex analysis of a sometimes slippery concept," and so "the term should be used sparingly." 2-ER-487. But it would "not order a ban on the term at trial," because that would be "impractical and awkward." 2-ER-487. So, the district court did not share the Government's reverent belief that the trademark holders were "the authority" on whether the marks or goods were "counterfeit." AB at 56–57.

Third, the Government at times characterizes the brand representatives' opinions as determining whether Apple and Samsung "manufactured" the phones. *See* AB at 54–55. That is misleading. The brand representatives testified that the phones were "counterfeit" *without* considering who originally manufactured them. They (1) analyzed only superficial characteristics of the phones, (2) explained that those characteristics were inconsistent with genuine Apple or Samsung products, (3) described the trademarks as "counterfeit," and

36

(4) thus deemed the phones themselves to be "counterfeit." *See generally* 15-ER-3958–4211; 15-ER-4214–16-ER-4380; *see also* AB at 13.

As discussed above, (3) is incorrect under § 2320 because a "fake" trademark is not necessarily a "counterfeit" one. *See* JOB at 32–35, 60; 2-ER-486–87 (the district court agreeing). Likewise, (4) is incorrect under § 2320 because a good is not "counterfeit" if it bears a "fake" mark that correctly identifies the origin of the good. *See* JOB at 32–35, 60; 2-ER-484–85 (the district court agreeing). To be sure, there is no evidence that these phones were originally manufactured from whole cloth by someone other than Apple and Samsung, but the brand representatives were also careful not to acknowledge as much. *See e.g.,* 16-ER-4315–16.

Fourth, the Government's claim that the trademark holders alone can determine whether the marks and phones at issue were "counterfeit" is fundamentally at odds with our criminal justice system. *See* AB at 55, 57. The Appellants have a Fifth Amendment right to a jury determination regarding each element of the charged crime. U.S. Const. amend. V; *In re Winship*, 397 U.S. 358, 364 (1970). That includes the determination that the goods were counterfeit because they bore trademarks that misidentified the origin of the goods. *See* 2-ER-413–14;

37

2-ER-406; 2-ER-408. The brand representatives infringed on the role of the jury by declaring the marks and phones to be counterfeit. *See* JOB at 59–60.

This Court should be particularly concerned with the Government's claim here that the trademark holders—two immensely powerful corporations—essentially act as prosecutor and jury with respect to the counterfeit determination. "Prosecutor" because the trademark holders purportedly have the "exclusive right" to prohibit trafficking in counterfeit goods. AB at 55. And "jury" because that only "trademark-holder experts" can determine whether a mark is "counterfeit." AB at 57. Our justice system does not countenance either proposition.

### D. The Government's and its witnesses' misuse of "counterfeit" was not harmless.

The Government does not address the Appellants' contention that this error rose to the level of a constitutional violation thus requiring it to prove beyond a reasonable doubt that the error did not "contribute to the verdict obtained." *See* JOB at 53–54, 63 (citing *Chapman*, 386 U.S. at 24). Regardless, the Government has failed to meet even the lower burden of proving it is more probable than not that the error did not

materially affect the jury's verdict. *See United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997)). The two meager arguments it makes regarding harmlessness are both undermined by the record.

On the one hand, the Government claims that the district court's jury instructions cured any error. AB at 58. But those instructions were woefully inadequate in this complex case. Again, the trial involved seven defendants, nineteen counts, and lasted 37 days. The testimony was convoluted, technical, and difficult to keep straight. And yet the district court did not even define "counterfeit" under § 2320 until the final jury instructions at the end of the trial, *see* 2-ER-372–444, instead telling the jury to essentially "hold off" on deciding whether the witnesses were using the term correctly until the very end of the trial.

To make matters worse, the few cautionary instructions were vague and incorrect. For example, the district court told the jury: "[W]hen a witness or counsel uses a term like 'counterfeit,' . . . they are using their own understanding of that term, and it *may or may not* correspond with the definition the Court gives you at the end of the trial." 15-ER-3992–93 (emphasis added). To the contrary, the brand

39

representatives' use of that term was utterly at odds with § 2320 and, at the very least, the jury should have been instructed accordingly.

On the other hand, the Government speculates that the acquittal on Count 28 shows the jury did not simply rubber-stamp the brand representatives' testimony that the goods were counterfeit. AB at 58. The Government ignores the evidence relevant to that count.

Count 28 charged Mr. Bibikov with trafficking in counterfeit goods related to his sale of Apple iPhones, packaging, and chargers to Vadim Dmitruk on December 2, 2016. *See* 7-ER-1803–04; 5-ER-1171. Notably, Caras did not specifically testify about the chargers related to Count 28. *See generally* 15-ER-4214–16-ER-4380. The chargers were admitted through Agent Sheehan as Exhibits 5010.C.1 through 5010.C.6, 7-ER-1805, and he testified that he did not see any flaws in one of those chargers, 8-ER-2116–17. Agent Sheehan further testified that Dmitruk had pointed out flaws on *other* chargers during the recorded controlled buy from Mr. Bibikov, but Mr. Bibikov had said he was selling only other, "original OEM" chargers to Dmitruk. 8-ER-2117–18; 25-ER-7055–56.

40

Thus, the jury likely found that the chargers in Count 28 were authentic, as shown by the Government's own evidence, or that Mr. Bibikov believed they were authentic, because he was unwittingly recorded stating as much. Either way, the acquittal on Count 28 does not show the erroneous misuse of the term "counterfeit" was harmless.

The district court abused its discretion by allowing the Government and its witnesses to repeatedly misuse the term "counterfeit" at trial, that error rendered the Appellants' trial fundamentally unfair, and the Government has failed to prove the error was harmless by any measure.

**V.     The district court constructively amended the superseding indictment by instructing the jury that it could convict the Appellants for conspiracy to traffic in counterfeit labels and packaging separately from any goods.**

The Appellants have asked this Court to vacate the conviction in Count 20 because the superseding indictment charged them with conspiring to traffic only in counterfeit goods, but the district court instructed the jury it could convict the Appellants of conspiracy to traffic in labels and packaging independent of any goods. *See* JOB at 63–70. In response, the Government incorrectly contends labels are a subpart of goods, ignores that the language in the indictment tracks

41

with § 2320(a)(1), and does not support its argument with the statute's language or relevant precedent.

### A. Labels are not a subpart of goods.

Relying on a 1980 civil case, the Government claims § 2320 defines labels as a subpart of goods and, thus, the indictment's reference to labels and packaging used to traffic goods charged a conspiracy to traffic in labels and packaging separately from goods. *See* AB at 62 (citing *May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211, 1215 (9th Cir. 1980)). The Government fails to acknowledge *United States v. Giles*, 213 F.3d 1247 (10th Cir. 2000), *see* JOB at 67–68, or to cite other relevant authority.

*Giles* illustrates the conduct that Congress intended to criminalize by amending § 2320 to create the crime of trafficking in counterfeit labels and packaging. Giles sold patch sets with the Dooney & Bourke logo *unconnected to goods* registered under the trademark, such as handbags, briefcases, and luggage. 213 F.3d at 1251–52. The Court held that the patches were not "goods" under § 2320 because trafficking in counterfeit goods requires that a counterfeit mark be used on or in connection with goods *for which the mark is actually registered. Id.*

42

In the wake of *Giles*, Congress added subsection (a)(2) to § 2320. *See* Pub. L. No. 109-181, 120 Stat. 285 (2006). That subsection covers the conduct that was found *not* to be criminalized in *Giles*. Section 2320(a)(2) applies when a person intentionally traffics in labels or packaging bearing a counterfeit mark if the use of that mark is likely to cause confusion. Congress also expanded one part of the definition of "counterfeit mark" to include spurious marks on labels and packaging that is "*intended to be used* on or in connection with the goods or services for which the mark is registered." § 2320(f)(1)(A)(iii) (emphasis added).

Contrary to the Government's suggestion, labels and packaging are distinct from goods under § 2320, and criminal liability depends on the labels and packaging's relationship to goods registered by the trademark. Count 20 alleged labels and packaging were used *in connection with the goods* in this case, and did not allege that the Appellants trafficked labels and packaging *independently of* goods.

## B.    The indictment's language tracks § 2320(a)(1), not (a)(2).

The Government claims the superseding indictment describes a conspiracy to traffic in labels and packaging from "page one." AB at 60.

43

In fact, the indictment tracks the language of § 2320(a)(1) by alleging the Appellants engaged in a scheme to defraud customers by repackaging counterfeit phones and accessories to make them appear new and genuine. For example, Count 1 describes the conspiracy to commit wire fraud as "a scheme to defraud" by "purchasing counterfeit electronic devices, including Apple and Samsung cell phones, to then resell as genuine and new on online platforms." 5-ER-1162–64. Count 20 alleges a conspiracy to traffic in *counterfeit goods*, by importing and offering for sale counterfeit Apple and Samsung cell phones, accessories, labels, and packaging for the same, and thereby knowingly using counterfeit marks on or in connection *with such goods*. 5-ER-1167–68. And Counts 21 to 29 allege trafficking in counterfeit phones and accessories. 5-ER-1168–72.

The Government ignores the role of labels to traffic goods under § 2320(a)(1) and asserts Count 20 charged a conspiracy to traffic in labels under (a)(2) because "the plain language of the conspiracy charge explicitly included labels and packaging as part of the conspiracy." AB at 60–61. But § 2320(a)(2) plainly applies when the item being trafficked is labels or packaging *separate from goods*, whereas

44

§ 2320(a)(1) applies when the labels and packaging are *used to traffic goods*. Only the latter was charged in this case.

Next, according to the Government, Count 20 "paralleled" § 2320(a)'s structure by adopting the statute's title and "specified that the conspiracy under § 2320(a) included goods, packages, and labels in the allegation citing the two subsections of § 2320(a)(1) and (a)(2)." AB at 62. The Government does not support that position with meaningful discussion of the indictment or statute.

Count 20 alleges that the Appellants conspired "to traffic in counterfeit goods, to wit: by importing and offering for sale" counterfeit phones and accessories, "labels, and packaging for the same," and therefore using counterfeit trademarks "on and in connection with such goods." 5-ER-1167–68. The indictment does not contain the phrase "traffic in labels and packaging," nor does it accuse the Appellants of trafficking counterfeit labels and packaging independently from the registered goods. *See generally* 5-ER-1158–73. Instead, the indictment consistently tracks § 2320(a)(1) by claiming that the Appellants conspired to traffic in counterfeit goods by using labels and packaging bearing counterfeit marks to repackage goods registered under

45

Samsung and Apple's trademarks.

If the Government means to suggest that Count 20 *itself* "cit[ed] the two subsections of § 2320(a)(1) and (a)(2)," AB at 62, that is incorrect. The indictment only cites to § 2320(a)(2) in the caption on the first page. Counts 20 through 34 cite § 2320(a) in charging trafficking in counterfeit "goods," without specifying a further subsection. The Appellants have already explained that "the caption is completely surplusage and does not control the body of the indictment," nor is "the statutory citation . . . regarded as part of the indictment." *United States v. Pazsint*, 703 F.2d 420, 423 (9th Cir. 1983); *see* JOB at 69–70. The Government has presented no argument or authority to the contrary.

The Government also mischaracterizes the Appellants' argument as too technical and as claiming that the "to-wit clause erased the other language in the Superseding Indictment." AB at 63. To the contrary, Count 20 is consistent with the rest of the indictment; both only allege the labels were used *on and in connection with* trademarked goods, and not trafficked independently of any goods. *See generally* 5-ER-1158–73 (emphasis added). This is not a mere "grammatical argument" as the Government claims; the superseding indictment did not put the

46

Appellants on notice that they were charged with trafficking in counterfeit labels and packaging independently from goods under § 2320(a)(2). *See* AB at 63.

The Government has failed to distinguish *United States v. Garcia-Paz*, 282 F.3d 1212 (9th Cir. 2002). *See* AB at 65–66. There, the indictment alleged that Garcia-Paz "did knowingly import and bring into the United States certain merchandise, *to wit, marijuana*, contrary to law." 282 F.3d at 1215 (emphasis added). Garcia-Paz argued that the district court erred by not instructing the jury that it had to find he knowingly imported marijuana, not just that he knowingly imported merchandise, to convict. *Id.* This Court rejected that argument, explaining: "from a purely textual and definitional analysis . . . [t]he inclusion of the 'to wit' phrase in the indictment was mere surplusage . . . ." *Id.* at 1215–16. "To wit" means "that is to say; namely," and therefore it does not add to the crime charged, but rather describes it. *Id.* at 1215.

The same is true here. The language about "labels and packaging" in the "to wit" clause did not change the fact that the Government only charged the Appellants with conspiracy to traffic in counterfeit goods

47

and did not charge them with conspiracy to traffic in counterfeit labels and packaging. It only described the charge of trafficking in counterfeit goods, namely that the Appellants used labels and packaging on or in connection with the trafficked goods. *See* 5-ER-1167–68. In other words, Garcia-Paz sought to *narrow* the charge by relying on the to wit clause, while here the Government *broadened* the charge by relying on the to wit clause. *See Garcia-Paz*, 282 F.3d at 1215–16. Neither interpretation is sustainable under the reasoning in *Garcia-Paz*.

The district court constructively amended the superseding indictment by instructing the jury that it could convict the Appellants for conspiracy to traffic in counterfeit labels and packaging separately from any goods.

## VI. This Court must vacate the convictions because the errors in this case cumulatively deprived the Appellants of their right to a fair trial.

The Government asserts that there are no errors to cumulate, and that any errors are harmless because the Government presented a strong case. AB at 67. The paucity of the Government's argument is revealing. It does not even attempt to counter the Appellants' explanation of how the errors in this case amplified one another in

48

relation to the central question of whether the phones were counterfeit, that the errors infected the trial from beginning to end, and that they made the jury's already-difficult job impossible. *See* JOB at 70–72. Because the errors in this case deprived the Appellants of their right to present a complete defense, to a fair trial, and to due process, this Court must vacate the Appellants' convictions and remand for a new trial.

## VII. The district court miscalculated the forfeiture money judgments by erroneously interpreting the law and evidence.

The definition of forfeitable "proceeds" for wire or mail fraud depends on whether the crimes involve illegal goods or lawful goods. Gross proceeds are forfeitable when illegal goods are involved, but only net profits are forfeitable when lawful goods are involved. *See* JOB at 74; AB at 71; *compare* 18 U.S.C. § 981(a)(2)(A) *with* § 981(a)(2)(B).

The Government argues that counterfeit goods can never be lawful because they are contraband. But that is plainly wrong. Counterfeit goods can be possessed lawfully, so § 981(a)(2)(A) applies to the Appellants' fraud convictions. The legislative history, text, and structure of § 2323 show that the distinction between illegal and lawful goods also applies to trafficking in counterfeit goods under § 2320.

49

In this case, the difference between gross and net amounts to millions of dollars—and millions more because the district court erroneously included proceeds from the sale of products not made by Apple or Samsung in its calculation. The court erred by failing to examine the scope of the fraudulent scheme alleged in the superseding indictment, which was limited to only two manufacturers' products— Apple and Samsung. Therefore the "supplier evidence" relied upon by the district court was overbroad.

## A. Counterfeit goods are not contraband.

The Government argues that because the jury found the goods sold were counterfeit, there is "no question that the 'goods' underlying the fraud scheme were also contraband." AB at 71. That is a false equivalence. "An object is contraband per se if its possession, without more, constitutes a crime; or in other words, if there is no legal purpose to which the object could be put." *United States v. Harrell*, 530 F.3d 1051, 1057 (9th Cir. 2008). But counterfeit goods cannot be per se contraband because their mere possession is not a crime. *See Wang v. Rodriguez*, 830 F.3d 958, 961 (9th Cir. 2016); § 2320(a)(1), (f)(5). For

50

example, a person who buys a knock-off designer purse for personal use possesses a counterfeit good but has not committed a crime.

To begin, the Government contradicts itself by acknowledging that mere possession of counterfeit goods is not unlawful *unless* there is an accompanying intent to sell the item. *See* AB at 73. To be sure, this Court has stated that in enacting § 2320, Congress intended to address commercial counterfeiting by providing for stiff penalties "for those who intentionally traffic in goods or services knowing them to be counterfeit." *Petrosian,* 126 F.3d at 1234. The Government quoted this very language in its brief. *See* AB at 101. The legislative history and plain language of the statute make clear that it is not unlawful to merely possess counterfeit goods.

Tellingly, the Government has not cited any authority interpreting the statutes at issue because none mention "contraband." The references cited by the Government are from other contexts, and they fail to support its effort to equate counterfeit goods with contraband.

For instance, 19 U.S.C. § 1595(a) grants Customs and Border Protection ("CBP") authority to seize counterfeit goods entering the

United States. *See* AB at 71. But the Government has ignored the personal use exemption in § 1526(d)(1), which states that restrictions on importing goods with counterfeit trademarks do not apply to "articles accompanying any person arriving in the United States when such articles are for his personal use and not for sale . . . ."

The Government also cites to 19 U.S.C. § 1337(a)(1)(C), *see* AB at 71, which addresses the *unlawful activity* of *importing* "articles that infringe a valid and enforceable United States trademark." The Government misleadingly argues that the statute characterizes the articles themselves as unlawful. *See* AB at 71. That statute, like § 2320, criminalizes how goods are handled, not the goods themselves.

The concurrence in *Watkins v. U.S. Bureau of Customs and Border Protection*, 643 F.3d 1189, 1202 (9th Cir. 2011), is also unavailing. The issue there was whether the district court erred by applying the trade secrets exemption from the Freedom of Information Act to grant summary judgment for CBP. *Id.* at 1192. Judge Smith wrote separately to opine that the exemption should only apply to seizure notices connected to shipments seized by mistake. *Id.* at 1202. Contrary to the majority's holding, Judge Smith characterized the notice as creating a

52

"rebuttable presumption" of counterfeiting liability. *Id.* Neither the majority nor the concurring judge had occasion to consider the treatment of counterfeit goods as contraband on a per se basis, and certainly not in the context of § 2320.

Finally, the definitions within Title 49 are expressly limited to "this section." 49 U.S.C. § 80302; *see* AB at 72. Accordingly, narcotics and counterfeit goods are classified as "contraband" under specific circumstances relating to aircraft, vehicles, or vessels. This designation authorizes the Government to seize and forfeit such items through equivalent procedures. 49 U.S.C. § 80303. The statute has no applicability to, and does not inform the meaning of, counterfeit goods under § 2320.

In sum, none of the Government's cited authorities substantiate its claim that counterfeit goods are inherently unlawful because they are invariably regarded as contraband. If anything, these authorities show that the law characterizes counterfeit goods as contraband only in limited circumstances and includes exceptions that prove the Appellants' point: Counterfeit goods may be possessed lawfully.

53

**B.    The Government's interpretation of § 2323 as providing an "independent path" for forfeiting gross proceeds overlooks the statute's reliance on substantive provisions of civil forfeiture law.**

Forfeitures under § 2320 are subject to the provisions of § 2323. *See* § 2320(c). But the Government is wrong in claiming that § 2323(a)(1)(C) "explicitly defines proceeds as '[a]ny property constituting or derived from proceeds obtained directly or indirectly as a result of the commission of' the offense." AB at 73–74. That language defines forfeitable property, not proceeds. Indeed, § 2323 provides no definition of "proceeds."

**1.    The definition of "proceeds" within § 2323 refers to civil forfeiture and does not apply to this criminal forfeiture.**

The question before the Court is a substantive one: What is the definition of criminally derived "proceeds" of trafficking in counterfeit goods? The Government conflates § 2323's division between substantive and procedural provisions. *See* AB at 76. The *procedures* for *criminal* forfeitures related to counterfeit goods follow 18 U.S.C. § 853. *See* § 2323(b)(2)(A). From there, the Government concludes that § 981 does not apply because it provides the *procedural* framework for *civil* forfeiture of counterfeit goods. AB at 76; § 2323(a)(2). Not so fast.

54

To find a definition of *any* criminally forfeitable property, the statute refers to the *civil* forfeiture provisions in § 2323(a)(1). *See* § 2323(b)(1) (noting that "the person [shall] forfeit . . . any property subject to forfeiture under subsection (a)"). By using this type of looping back in the statute, Congress must have intended for the *substantive* definition of proceeds to be identical for civil and criminal trafficking in counterfeit goods. Stated another way, Congress did not intend for a broader, more punitive definition of forfeiture in criminal counterfeit goods and a narrower definition in civil matters. They are one and the same. Whatever proceeds are forfeitable civilly, but to that extent only, can be forfeitable criminally.

There are two places where "proceeds" are authorized to be forfeited in trafficking in counterfeit goods cases: This statute, § 2323(a)(1)(C), and through the general civil forfeiture statute, § 981(a). There, like wire and mail fraud, "trafficking in counterfeit goods and services" is listed as "a specified unlawful activity" (§ 1956(c)(7)(D)), to which the § 981 forfeiture provisions apply. But unlike in § 2323(a)(1)(C), § 981(a)(2) defines forfeitable "proceeds" as gross versus net, depending on the type of goods, services, and activities at

55

issue. If this Court were to accept the Government's invitation to look only at § 2323(a)(1)(C) (again, a civil forfeiture provision) to find that proceeds always means "gross receipts," that would read out of the U.S. Code the definition of "proceeds" involving counterfeit goods cases that Congress included within § 981(a)(2). To harmonize those provisions, the Court should conclude that § 981(a)(2) provides the definition of "proceeds" used in § 2323(a)(1)(C).[4]

> **2. Neither the legislative history of § 2323 nor the cases cited by the Government support its argument that § 2323 was meant to expand criminal forfeiture of counterfeiting proceeds beyond that provided for under civil forfeiture law.**

The Government's contention that Congress intended to expand criminal forfeiture beyond that which is allowable civilly is not

---

[4] This is the result suggested by one leading forfeiture expert:

> Although the definition of proceeds by its terms applies only to cases under section 981(a)(1), it is necessary to apply the same definition to criminal forfeiture cases which are based on section 981(a)(1) through the "piggy-back" provision of 28 U.S.C. § 2461(c). Indeed, it would not be unreasonable to apply the same definition to all criminal forfeiture cases involving proceeds.

1 David B. Smith, Prosecution and Defense of Forfeiture Cases, ¶ 5.03[2], at 5-65 (2021) (footnote omitted).

consistent with the timing of the legislative history on which the Government relies. *See* AB at 74. Congress codified § 981(a)(1)'s current definition of "proceeds" (including its distinction between lawful and unlawful goods) in 2000, eight years before it enacted § 2323(a)(1). *See* Pub. L. No. 106-185, sec.20, 114 Stat. 202 (2000). Congress is presumed to have been aware of the already-existing definition of forfeitable proceeds in § 981(a)(1). *See e.g., Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Had Congress wanted to alter that definition, it could have simply put the word "gross" before "proceeds" in § 2323(a)(1)(C). It chose not to, implying that it was satisfied with the definition that distinguished between net and gross proceeds.

The text and structure of the statute also suggest that Congress intended for all criminal forfeitures in an intellectual property case to be remedial like a civil case. In support of its contrary argument, the Government points to several cases, none of which squarely apply to the question before the Court. In *United States v. Hon*, the Court considered the legislative history of § 2320, which was enacted in 1984, in the context of the "likely to confuse" element of § 2320. 904 F.2d at 804–05. Congress's intent to impose "stiff criminal penalties" on individuals

57

whose conduct was previously only subject to civil sanctions, *id.* at 806, says nothing about the definition of proceeds in a forfeiture statute enacted 24 years later. The *Hon* Court did not consider any forfeiture issue. It certainly did not state, as the Government represents, that Congress intended § 2323 to expand criminal forfeiture of intellectual property crimes. *See* AB at 77. In fact, § 2323 does not appear anywhere in the opinion.

The Government similarly misapprehends the applicability of *United States v. Prasad*, 18 F.4th 313 (9th Cir. 2021), which interpreted the phrase "directly or indirectly" in § 982(a)(6)(A)(ii)(I) (visa fraud) as meaning gross receipts. *See* AB at 77–79. The Court held that because the word "proceeds" in § 982(a)(6)(A)(ii)(I) is ambiguous, it would be construed consistently with other interpretations of § 982(b). *Id.* at 320. Notably, it did not identify § 981 as "materially similar" to § 982. *Id.* at 324. *See also United States v. Omidi*, 125 F.4th 1283, 1288 (9th Cir. 2025) (declining to apply a case construing "an entirely different forfeiture statute—18 U.S.C. § 982(a)(1)" to a forfeiture under § 981(a)(1)(C)).

58

There are other important differences, too. First, § 982(a)(6)(A)(ii)(I) does not incorporate by reference any civil forfeiture provision. Second, whereas § 982 explicitly applies to convictions under dozens of statutes, § 2320 is not one of them. *See* § 982(a)(1)–(a)(8). Finally, in its discussion of § 1963(a)(3), the *Prasad* Court considered *United States v. Christensen*, 828 F.3d 763, 822 (9th Cir. 2015), which the Government also cited in its brief. *See* AB at 75; *Prasad*, 18 F.4th at 313. Like *Prasad*, the forfeiture provision at issue in *Christensen* was § 982 and its holding regarding proceeds was limited to that statute. *See* 828 F.3d at 822–24.

### 3. Trafficking in counterfeit goods is similar to the types of cases to which § 981(a)(2) applies.

As a policy matter, it would make sense for Congress to decide that § 981(a)(2)'s provision fills in the definition of "proceeds" in this type of case. Trafficking in counterfeit goods is similar to the types of cases to which § 981(a)(2) applies, like wire and mail fraud. It is a species of fraudulent activity that may be conducted by otherwise legitimate businesses. In enacting § 981(a)(2), Congress sought to clarify the "confused body of case law" concerning the definition of proceeds by defining "criminal proceeds" to exclude direct costs for those

who sold lawful goods in an unlawful manner. Only health care fraud was exempted. When Senator Leahy presented the new legislation, he stated that it "broadly extends the government's authority to forfeit criminal proceeds under the civil asset forfeiture laws." 146 Cong. Rec. S1753-02, 2000 WL 309749 (March 27, 2000).

### 4. The Court should apply the rule of lenity to resolve any ambiguity in the Appellants' favor.

If the Court declines to apply the definition of proceeds in § 981(a)(2), it should nevertheless hold that "proceeds" under § 2323(a)(1)(C) means net proceeds because its meaning is, at the very least, ambiguous. *Prasad*, 18 F.4th at 320. In *United States v. Santos*, 553 U.S. 507, 514–15 (2008), for example, the Court applied the rule of lenity to construe the term "proceeds" in the money laundering statute to be limited to profits. The Court should likewise apply the rule of lenity to resolve any ambiguity in Appellants' favor.

### C. The district court's reliance on "supplier evidence" was erroneous because that metric included brands outside of the fraudulent scheme alleged in the superseding indictment.

Appellants have argued that the district court erred by including products made by Casio, HTC, Kyocera, LG, Motorola, Sprint, Blackberry, and Nokia because none of those manufacturers were part

of the fraudulent scheme alleged in the superseding indictment. JOB at 83–87. In fact, the only manufacturers identified throughout the superseding indictment are Apple and Samsung. 5-ER-1158–91.

The issue presented here does not turn on whether trial evidence supported a finding that products made by these other manufacturers were counterfeit, as the Government argues. *See* AB at 80. Neither does it turn on evidence that the Appellants treated those products consistently with the way they treated products made by Apple and Samsung. *Id.* Instead, the issue before the Court turns on the scope of the fraudulent scheme described in the superseding indictment. *United States v. Lo*, 839 F.3d. 777, 793–94 (9th Cir. 2016). This is because the scope of the scheme determines the requisite nexus between the crime and the property sought for forfeiture. Fed. R. Crim. P. 32.2(b). Therefore, even if the suppliers were unindicted co-conspirators "in this scheme," AB at 80, the scope of "this scheme" is limited to electronic devices made by Apple and Samsung, regardless of the business that supplied them.

The Government correctly quotes *Lo* as permitting forfeiture of proceeds based on "additional executions of the scheme" alleged in an

61

indictment. *Id.* at 793. Accordingly, a reviewing Court must determine the scope of the scheme and then consider whether the proceeds at issue were gleaned from additional executions of that scheme. If they were, the proceeds are forfeitable. Conversely, the district court cannot order the forfeiture of proceeds that were not obtained within the scope of the *alleged* fraudulent scheme.

The facts of *Lo* are instructive. Lo pleaded guilty to three counts of wire fraud and one count of mail fraud. *Id.* at 781. The Court rejected his claim that the forfeiture proceeds were limited to those associated with the counts of conviction, but not because criminal proceeds always include "executions of the scheme" that were not "specifically charged or on which the defendant was acquitted." *Id.* Instead, the Court examined the counts to which Lo pleaded guilty in relation to the scheme to defraud charged in the indictment. Because each count included both the scheme to defraud and a specific use of the wires or mail as an act in furtherance of that scheme, the Court construed forfeitable proceeds to include the funds obtained from the entire scheme to defraud. *Id.* at 793–94; *see also United States v. Cline*, 148 F.4th 1162, 1177 (10th Cir. 2025) (summarizing *Lo* as holding that "forfeiture turns on the scope of

62

the whole scheme, not just on the specific transfers identified in the indictment.")

Turning to the facts at hand, the Appellants were convicted of conspiracy to commit wire fraud alleged in Count 1, which twice describes the scheme to defraud as one involving the sale of "counterfeit electronic devices, including counterfeit Apple and Samsung cell phones," that the defendants represented to be new and genuine. 5-ER-1162 (¶¶ 14, 15). The conspiracy to traffic in counterfeit goods charged in Count 20 incorporates those paragraphs, and goes on to identify ten distinct products, including their trademark registration numbers, made only by Apple and Samsung. 5-ER-1167.

A fair reading of the entire superseding indictment compels the conclusion that Apple and Samsung are not merely illustrations of the scheme to defraud. Significantly, there are two paragraphs under the heading "Trademark Holder-Victims." One paragraph identifies Apple Incorporated and the other identifies Samsung Electronics. 5-ER-1161–62. No other manufacturer is named as a victim of the fraudulent scheme, whose trademark was infringed. Indeed, no other manufacturer is named *anywhere* in the superseding indictment. 5-ER-1158–73.

Reading the superseding indictment as a whole, it is abundantly clear that the scope of the fraudulent scheme, executed by using wire transfers and the mail, and the trafficking of counterfeit products, was limited to Apple and Samsung products. *See Lo*, 839 F.3d at 793–94; *Cline*, 148 F.4th at 1177.

*United States v. Omidi* is also instructive of this point. Omidi was convicted of mail fraud, wire fraud, and money laundering based on a health insurance fraud scheme involving false claims for reimbursement for patients who sought weight loss treatments. 125 F.4th at 1285–86. He challenged the forfeiture of gross proceeds because some patients received legitimate procedures. *Id.* at 1287. Applying § 981(a)(2)(A), the Court agreed that gross proceeds were forfeitable because all patients were initially recruited through a call center, 1-800-GET-THIN. *Id.* at 1287–88. Therefore, the Court reasoned, all the business's proceeds were derived from a single intake process that was, by design, at the center of the fraudulent scheme alleged in the indictment. *Id.* at 1288–89.

Both *Lo* and *Omidi* affirm the principle that the scope of the fraudulent scheme drives the determination of forfeitable proceeds. In

64

*Lo*, the scheme was implemented in all counts of the indictment, thus forfeitable proceeds included all of the charges, not merely the ones to which Lo pleaded guilty. In *Omidi*, the scheme was executed through the call center, regardless of whether some patients received legitimate treatments. Here, by contrast, the fraudulent scheme underpinning every count in the superseding indictment involved only Apple and Samsung products. For that reason, the district court's inclusion of non-Apple and non-Samsung brands was more than an expansion to "additional executions" or "specific transfers" within the alleged scheme. It was an impermissible, expanded reconstruction of the fraudulent scheme described throughout the superseding indictment.

Consequently, the district court clearly erred by including products made by other manufacturers when calculating criminally derived proceeds. *See Lo*, 839 F.3d at 784. This Court must reduce the amount of each money judgment accordingly. *See* JOB at 86–87.

## CONCLUSION

The Appellants respectfully request that this Court vacate their judgments and remand to the district court for a new trial with correct jury instructions and Ellington's origin testimony, and without the

65

misuse of the term "counterfeit" and the uncharged offense of conspiracy to traffic in counterfeit labels and packaging. The Court should also order that the district court recalculate the Appellants' money judgments.

Date: May 11, 2026

/s/ Maya P. Waldron
Maya P. Waldron
/s/ Amy Krauss
Amy Krauss
*Attorneys for Defendant-Appellant*
*Pavel Babichenko*


/s/ Paul Riggins
Paul Riggins
/s/ Mike French
Mike French
*Attorneys for Defendant-Appellant*
*Piotr Babichenko*

/s/ Greg S. Silvey
Greg S. Silvey
/s/ Rob Lewis
Rob Lewis
*Attorneys for Defendant-Appellant*
*Timofey Babichenko*


/s/ Craig H. Durham
Craig H. Durham
*Attorney for Defendant-Appellant*
*Mikhail Iyerusalimets*


/s/ Robyn Fyffe
Robyn Fyffe
*Attorney for Defendant-Appellant*
*David Bibikov*

66

## Certificate of Compliance for Briefs

### 9th Cir. Case Numbers 23-549, 23-550, 23-558, 23-559, 23-561, 24-2188 & 24-2189

I am the attorney. **This brief contains 12,630 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[X] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/Maya P. Waldron*    **Date** May 11, 2026

67